Mr Justice Story
 

 delivered the opinion of the Court.
 

 This is a writ of error to the circuit court of the district of Columbia, sitting for .the county of Washington.
 

 The original was an actiori bn the case bróught by the plaintiffs in error against the defendant for waste committed by him, while tenarit of the plaintiffs, to their reversionary interest, by pulling down and removing from the demised prernises a messuage or dwelling house erected thereon and attached to the freehold. The-cause was tried upon the gerieral issúe, and a verdict found for the defendant, upon which a judgment passed m his favour; and the object of th‘é'present writ of érror is to'revise that judgment.-"
 

 By the bill" of exceptions; filed at the trial, it appeared that the plaintiffs in 1B20 demised to'the defendant, fori seven years, a
 
 vacant
 
 lot ip the city of Washington, at the' yearly rent of ,$112'50 cents, with a clause in'the léase tháf the defendant should have a right to purchase the sathe at any
 
 *142
 
 time daring the term for $1875.■ After the defendant had taken possession of the lot, he erected thereon, a wooden dwelling house, two stories high in front, with ashed of one story, a cellar of stone or brick foundation and a brick chimnéy. The defendant and his family dwelt, in the house from its erection until near the expiration of the lease, when he took the same down and removed all the materials from the ,íot. The defendant was a carpenter by trade .; and he gave evidence, that upon obtaining the lease he erected the building, above mentioned,
 
 with a view to carry on the business of a dairy man,
 
 and for' the residence of his family and servants- engaged in his said business; and that the cellar, in which there was a spring, was made and exclusively used for a milk cellar, in which the utensils of his said bdr siness were kept and scalded, and washed, and used; and that feed was kept in the upper part of the house, which was also occupied as a dwelling for his family. That the defendant had his tools as á carpenter, and two apprentices in the house, and a work-bench out of doors; and carpenter’s work was done in the house, which was in a rough unfinished state and made partly of old materials. That he also erected, on. the lot a stable for his cows of plank and timber fixed upon posts fastened into the ground, which stable he removed with the house before. the expiration of his lease.
 

 Upon this evidence, the. counsel for the plaintiffs prayed for an instruction, that if the' jury should believe the same to be true, the defendant was not justified in removing the said house from the premises; and that he was liable to the plaintiffs iii this action. This instruction the court refused to give; and' the refusal constitutes his first exception.
 

 The defendant farther offered, evidence to prove, that a usage and custom existed in the city^pf Washington, which authorised .a tenant to remove any building'whic'h he might erect upon rented premises, -provided he did it before the expiration of the term. The plaintiffs objected to this evidence; but. the court admitted it.; This constitutes the second exception- ...
 

 Testimony was then introduced on .this point, and after.
 
 *143
 
 the examination' of the witnesses for the defendant, the plaintiffs prayed the court to instruct the jury that the evidence was not competent to establish the fact, that a ger netal usage had existed-or did exist in the city of Washings ton,, which authorised a tenant, to remove such a :house as that erected by the . tenant in this case; nor was it competent for the jury to infer from the said evidence, that.such a usage ha<j existed. The court refused to give this instruction, and this constitutes the third exception.
 

 The counsel for the plaintiffs then introduced witnesses to disprove the usage; and after théir testimony was.given, he pray.ed the court to instruct the jury, that upon the evidence given as aforesaid in this case, it is not competent for them to find a usage or custom of the place fey which • the defendant could be justified in removing the house in-question; and there being no such usage, the plaintiffs are entitled to a verdict for the value of the house,.which the defendant pulled down and destroyed. The court, was divided and did not give the instruction so prayed;. and this constitutes the fourth exception.
 

 The’first exception raises the important question, what fixtures erected-by a tenant during his term, are removable by him
 

 The general rule of the common law certainly is, that whatever is once annexed to the freehold becomes párt of . it, and cannot afterwards be removed, except by him who is . entitled to the inheritance. The rule, however, never was, at least as- far back as we can trace it in .the books, inflexible, and without exceptions. It was construed most strictly between executor and heir in favour of the latter; more liberally between tenant for life or in tail, and remainder man or reversioner, in favour of the former; and with much greater latitude between landlord and tenant, in favour of the tenant. But an exception of a much broader cast, and whose origin may be traced almost as high as the rule itself, is of fixtures,erected for the purposes of trade. Upon principles of public policy, and to encourage trade and manufactures, fixtures which were erected to carry on such business, were allowed to be removed by the tenant during his
 
 *144
 
 term, and. were deemed personalty for maiiy other purposes. The principal cases are collected and reviewed by Lord Ellenborough in delivering the opinion of the eoiirt in Elwes
 
 vs.
 
 Maw, 3
 
 East’s R.
 
 38 ; and it seems unnecessary to do more than to refer to that case for a full summary of the general doctrine and its admitted exceptions in England. The court there decided, that in the case of landlord and tenant, there .had been no.relaxation of the general rule in casés of erections,
 
 solely for agricultural purposes,
 
 however beneficial or important they might be as improvements of •.the estate. Being once annexed to the freehold by the tenant, they became a part of the realty, and could never afterwards be severed by the tenant. The distinction is certainly a nice one between fixtures, for the purposes of. trade, ■ and fixtures for agricultural purposes; at least in those cases, where the sale of the produce constitutes the principal qbjec.t of the tenant, and the erections are for the purpose of such a beneficial enjoyment of the estate. But that point is not now before us ;■ and. it is unnecessary to. consider what the true doctrine is or .ought to. be on this subject. However well settled it may now be in England, it cannot escape remark, that learned judges at different periods in that country, have entertained different opinions upon it, down to the. very date of the.decision in Elwes
 
 vs.
 
 Maw, 3
 
 East’s R.
 
 38.
 

 The common law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its^general principles, and claimed it as their, birthright; but they brought with them and adopted only that portion which was applicable, to their situation. There could be little or no reason for doubting that the genera! doctrine as to things annexed to the freehold, so far as .it respects heirs ami executors, was adopted by them. The question .could arise only between different claimants under the same ancestor, and no general policy could be subserved, by withdrawing from the heir those things which his ancestor had chosen to leave annexed to the inheritance. But, between landlord, and tenant, it is not so clear that the rigid rule of the common law, at least as it is expounded in 3
 
 East,
 
 38,
 
 *145
 
 was so applicable to their situation, as to give rise to necessary presumption in its favour. The country was a wilderness, and the universal policy Was to procure its cultivation and improvement; ' The owner of the soil as w'ell as the public,. had every motive to encourage the tenant to devote himself to agriculture, and to favour any erections which should aid this result; yet, in the comparative poverty of the country, what tenant could afford to erect fixtures of much expense or value, if he was to lose his whole interest therein by the very act of erection
 
 %
 
 His cabin or log-hut, however necessary for any improvement of the soil; would cease to be. his the moment it was finished. It might; therefore, deserve consideration, whether, in cáse the doctrine were not previously adopted in a state by some Authoritative practice or adjudication; it ought to be assumed by this Court as a part of the jurisprudence of such state, upon the mere footing of its existence in the common law. At present, it is unnecessary to say iliore, than, that we give no opinion on this question. The casé which has been argued, at the bar, may well be disposed of without any discussion of.it.
 

 ; It has been already stated that the exception of buildings and other fixtures, for. the purpose of carrying on a trade .or manufacture, is of very ancient date, and was recognised almost as early as the rule itself. The very point wás decided in 20 Henry VIL. 13,
 
 a.
 
 and 6., where it was .laid down, that if a lessee fo’r years made a furnace for his advantage, or a dyer made his vats or vessels
 
 to occupy Ms occupation,
 
 during the term, be may afterWards remove them. That doctrine was recognised by lord Holt, in Poole’s case,. 1 Suift. 36S, in favour of a soap-boiler who was tenant fiar years.' He -held that the party might well remove the vats he set up in relation to trade; and. that he might do .it by the common law, (and not by virtue of any; custom)
 
 in favour of trade, and to entourage industry.
 
 .In Lawton
 
 vs.
 
 Lawton, 3
 
 Atk. R.
 
 13, the samé doctrine, was held in the.case of á fire .engine, set up to work á colliery by a tenant for life. Lord Hardwicke there said, that since the time of Henry the seventh, the general ground the courts have gone, upon of relaxing the strict construction of law is, that it is for the
 
 *146
 
 benefit of the public, to encourage tenants for life; to do what is advantageous to the estate during the term. He added, “ one reason which weighs with me is, its being, a
 
 mixed case,
 
 between enjoying the profits of the land, and carrying on a species of trade; and id considering it in this light, it comes very near the instances in brewhouses, &c. of furnaces and coppers.” The case too ofacider mill, between the executor and heir, &c. ;is extremely strong, for ^though cider is a part of the profits of the real estate,, yét, it was held by lord chief baron Comyns, a very able common lawyer, that the cider .mill was personal estate, notwithstanding, and that it should go to the executor. “It does not differ it, in
 
 niy
 
 opinion,
 
 whether the shed be made of brick or wood,
 
 for it is only intended to cover it from the weather and other inconveniences.” In Penton
 
 vs.
 
 Robart, 2
 
 East,
 
 88, it was further decided that a tenant might remove his fixtures for trade, even after the expiration of his term, if he yet remained in possessionj and lord Kenyon recognised the doctrine .in its most liberal extent.
 

 It has been suggested at the bar,' that this exception in favour of trade has never been applied to cases like that before the Court, where a large house has been built and ufeed in part as a family residence. But the question, whether removable or not, does not depend upon the form or size of the building, /whether it has a brick foundation or not, or is one of two stories high, or has a brick or other chimney. The sole question is, whether it is designed for purposes of trade or not. A tenant may erect a large as well as a small messuage, or a soap boilery of one or two stories high, and on whatever foundations he may choose. In Lawton
 
 vs.
 
 Lawton, 3
 
 Atk. R.
 
 13, lord Hardwicke said,
 
 (as
 
 we have already seen) that it made no difference whether the shed of the engine be made of brick or stone. In Penton
 
 vs.
 
 Robart, 2
 
 East’s R. 88,
 
 the building had a brick foundation, let into the ground, with á chimney belonging to.it, upon which there was a superstructure of wood. Yet the court thought the building removable. In Elwes
 
 vs.
 
 Maw, 3
 
 East’s R.
 
 37, lord. Ellenborough expressly stated, that there was no difference between the building covering any fixed engine,
 
 *147
 
 utensils, and the latter. The only point is, whether it is ac-cessary to carrying on the trade or not. If bona fide intended for this purpose, it falls within the exception in favour of trade. The cáse of the Dutch barns, before lord Kenyon
 
 (a)
 
 , is to the same effect;
 

 Then as to the residence of the family in the house, this .resolves itself into the same consideration. If the . house were built principally for a dwelling house for the family, independently of carrying on the trade, then it would doubtless be deemed a fixture, falling under the general rule,, and1 immovable. But if the residence of the family were merely an accessory for the more beneficial exercise of the trade, and with a. view to superior accommodation in this particular, then it is within the exception. There are many trades which cannot be carried on well, without the presence of máhy persons by night as well as by day. It-is so in some valuable manufactories. It is not Unusual for persons employed in% bakery to sleep in the same building. Now w.hat was the evidence in the present case*? It was, “ that the defendant, erected the building before mentioned,
 
 with a view to carry.on the business of a dairy man, and for the residence of his family and servants engaged in that
 
 business.” The .residence of the family was then auxiliary to the dairy; it was for the accommodation and'beneficial operationsof this trade.
 

 Surely, it cannot be doubtedj that in. a business .of this nature, the immediate presence of the family and servants, was, or might .be of Very great utility-and importance. The defendant was also a carpenter, and carried on his business, ás such, in the, same building. It is no objection that he. car-* ried on two trades ihstead of one.; There is not the. slightest evidence of this one being a mere' covet or evasion to conceal another, which was the principal design ; and, unless we were prepared to say (wliich we arc not j>; that the .mere fact that the house was used for á dwelling house, as well as for a trade, superseded the exception in favour of the latter, there is no. ground to declaré that the tenant was not entitled to remove it. At moct, it would be deemed only a mixed
 
 *148
 
 case, analogous in principle to those Before lord chief baron Comyns, and lord Hardwicke; and therefore entitled to the benefit of the exception. The case of Holmes
 
 vs.
 
 Tremper, 20
 
 Johns. R.
 
 29, proceeds upon principles equally libe- , rab; and it is quite certain that the supreme court of New York, were not prepared at that time to adopt the doctrine of Elwes
 
 vs.
 
 Maw, in respect to erections for agricultural purposes. In our opinión, the circuit court was right in refusing the first instruction.
 

 The second exception proceeds upon the ground that it Was not competent to establish a usage arid custom in the city Of Washington for tenants to make such removals of buildings during their term. We can perceive, xio objection to such proof. Every demise between landlord and tenant in respect to matters in which the parties are silent, may be fairly open to explanation by the general.usage and'custom of the country or of the district where the land lies. Every person under such circumstances is supposed tó be conusant Of the custom, and to contract with a tacit reference to it. Cases of this sort are familiar in the books; as fqr instance, to prove the right of a tenant to an away-going crop
 
 (a)
 
 . In the very class of cases now. before the Court the custom of the country has been admitted to decide the right of the tenant to remove ,fixtu’-es
 
 (b)
 
 . The case before lord chief justice Treby turned upon that point
 
 (c)
 
 .
 

 The third exception turns upon the consideration, whether the parol testimony was competent to establish such a usage and custom. Competent it certainly was, if by competent is meant, that it was admissible to go to the jury. Whether it was such as ought to have satisfied their minds on the matter of fact was solely for their consideration; open indeed to such commentary and observation as the court .might think proper in its discretion to lay before them for their aid and guidance. We cannot say that they were not at liberty, by the principles of law, to infer from the evidence the existence of the usage. The evidence might be somewhat loose
 
 *149
 
 and indeterminate, and so be urged with more or less effect ' upon their judgment; but in a legal sense it was within their, own province to weigh it as proof or as usage.
 

 The last exception professes to call upon the court to institute a comparison between the testimony introduced by the plaintiff and that introduced by the defendant against and fo.r the usage. It requires from the court a decision upon its relative weight and credibility, which the. court were not justified in giving to the jury in the shape of a positive instruction.
 

 Upon the whole in our judgment there is no error in the judgment of the circuit court; and it is affirmed with costs.
 

 This cause came on to be . heard on a transcript of the record from the circuit court of the United States, for the district of Columbia, holden in and for the county of Washington, and was argued by counsel; on consideration whereof, it is the opinion of this Court, that there is no error in the judgment of the said circuit court. Whereupon it is considered, ordered and adjudged by this Court, that the judg-meñt of the said circuit .court in this.cause, be, and the same is hereby affirmed with costs.
 

 (a)
 

 Dean
 
 vs.
 
 Allalley, 3
 
 Esp. Rep.
 
 11
 
 Woodfall’s Landlord & Tenant,
 
 219.
 

 (a)
 

 2
 
 Starkie on Evidence,
 
 Part XV. p. 468.
 

 (b)
 

 Woodfall’s Landlord & Tenant,
 
 218,
 

 (c)
 

 Buller’s Nisi Prius,
 
 34.