## STEERS and others *v.* DANIEL and others.

*(Circuit Court, W. D. Tennessee. July 25, 1880.)*

1. EXECUTION—LEASEHOLD AND MACHINERY—FIXTURES—How LEVIED AND SOLD—ABANDONMENT.—Leaseholds and ponderous machinery being incapable of actual possession, any notorious act asserting title under a levy is sufficient. Such fixtures as would, if the leasehold were a freehold estate, pass as part of the realty, cannot be detached and sold separately. *Held,* therefore, that the marshal need not take actual possession either of the leasehold or machinery; that he need not keep a watchman in charge, nor otherwise manifest a continuing control, nor detach the fixtures; and his failure to do so cannot be treated as an abandonment of his levy.

**2.** SAME—LEASEHOLDS—WHETHER CHATTELS OR REAL ESTATE.—In Tennessee, leaseholds are by statute to be treated, for the purposes of levy and sale under execution, as real estate, and judgments are a lien upon them. But, whether this be so or not, even at common law, and as chattels, they are to be levied on and sold substantially in the same manner as real estate is now levied on and sold, and the purchaser must bring ejectment to obtain possession. *Held*, therefore, that a paper levy, accompanied by such notorious claim of title as the nature of the case admits, is sufficient, and a failure to do more cannot be treated as an abandonment.

**3.** SAME SUBJECT—CASE IN JUDGMENT.—Where the marshal, having levied on a leasehold, and machinery constituting a cotton compress, placed a watchman in charge to protect it from fire, but subsequently withdrew him, and returned his writ with his levies indorsed, and reasons for not selling as advertised, and, without objection, the sheriff afterwards, with an attachment from a state court, at the suit of another creditor, took possession, *held*, that there was no abandonment by the marshal, and the execution creditor has a better title than a mortgagee to whom the debtor had in the meantime conveyed the property.

**4.** EXECUTION—ABANDONMENT OF LEVY—ESTOPPEL.—After a sufficient levy upon property of the defendant, if he procures a suspension of proceedings by securing from the judge of the court a letter of advice to the clerk to recall the execution, and an "order" from the clerk to the marshal to return it, whether the action of these officers be legal or illegal, he will be estopped from claiming an abandonment of the levy, nor can a subsequent mortgagee, with notice of the facts, set up such a claim in favor of his title.

**5.** RES JUDICATA—MOTION.—A motion for a *venditioni exponas*, resisted by affidavits to show an abandonment of the levy, is not such a trial on the merits as will be *res judicata* of the questions involved, and does not preclude a bill to enjoin further proceedings.

In Equity.

The defendant Daniel, in January, 1878, leased from one Mitchell and from one Lea, for a period of six years, two parcels of land in Memphis, on Washington and High streets, upon which he erected a Morse Improved Tyler cotton compress, with necessary engines, boilers, machinery sheds, and buildings, to be used in compressing cotton bales. This press is of the most ponderous character, weighing many tons, and was fixed to the soil in the most substantial manner possible, with foundations let deeply into it, as it must be to be used at all. The necessary engines and other machinery were also

built and fixed with brick and mortar. The buildings, except one frame house with rooms, were mere sheds to protect the compress and machinery, the lots being enclosed with a fence. He used the whole in his business of compressing cotton bales. This press and machinery he purchased of the plaintiffs, largely on a credit, under a written contract found in the record, and under which the plaintiffs constructed the establishment. The leases contained the usual covenants for renewal, for forfeiture for non-payment of rent, taxes, etc., and also one that at the end of the term, all rent and taxes being paid, Daniel might remove the improvements.

On the sixth of June, 1878, one Dawson, a defendant in this suit, recovered on the law side of this court two judgments against Daniel, aggregating $5,629, upon which writs of *fieri facias* issued July 5, 1878, and they were by the marshal, on the ninth of July, 1878, levied "upon the leasehold interest of R. C. Daniel in and to lots 516, etc., (describing them by metes and bounds, and length of term, date of leases, etc.,) and also the interest of R. C. Daniel in and to the Morse Improved Tyler cotton compress, with all its appurtenances and belongings, located in and upon said lots." The indorsement of the levy was accompanied by a more minute description of the leases and ground which was attached to the writ. The marshal advertised the property for sale in a newspaper, gave notice of the levy and sale to one Sarah E. Berry, an occupant of the rooms in the building, and posted notices upon the premises and at the court-house, as fully described in his return to the writs. At the time he made the levy, the marshal, accompanied by the attorney of the execution plaintiff, went upon the premises, found the gates shut, the machinery idle, and the rooms formerly used as an office occupied by a woman and her children They entered, and the marshal declared his levy, notified the woman of it, and because the place seemed in danger of fire, by reason of the combustible character of the sheds and material about the press, the attorney agreed to pay the expenses of a watchman, and one was placed in charge.

It is stated, by both the marshal and attorney, that the

watchman was placed in charge solely for this purpose, and not for any purpose of taking possession or strengthening the levy. Matters remained in this condition until, sometime prior to August 5, 1878, Daniel's attorney addressed a letter to the circuit judge of this court, at Knoxville, enclosing certified copies of the record in the case of *Dawson* v. *Daniel*, and making some application for relief against the action of the plaintiff in suing out the execution, the character of which does not clearly appear, except that in his reply to the attorney, which is in evidence in this case, the circuit judge says it is of questionable shape, being neither a bill in chancery nor an application for specific relief. He, however, encloses them a letter to the clerk of the court, and tells them if it cannot be made available they must proceed by a bill of injunction. To explain the bearing of these letters upon the questions arising in this case, it is necessary to state that the judgments against Daniel were rendered at the May term, 1878, by default, and he entered a motion to set aside the default, and for a new trial.

This motion was continued "without prejudice to the plaintiff," until the next term, and the court adjourned. Notwithstanding the pendency of this motion for a new trial, executions were issued and levied as before stated, and the complaint was made to the circuit judge that the clerk had improperly issued them prematurely. The circuit judge, in his letters, expresses the belief that they were prematurely issued, and ought to be recalled, "if that idea be correct, until the merits of the case can be inquired into and adjudicated." In his letter to the clerk he says that the executions ought to be called in as improvidently issued. The clerk treated this as an order, and, under the seal of the court, on the seventh of August, 1878, addressed "an order" to the marshal, accompanied with a copy of the letter of the judge, "notifying" him that the executions were issued without authority, and "requesting him to return the same unexecuted." Upon the receipt of this "order" the marshal returned his writs on the seventh of August, with this indorsement added to that of his levy: "In obedience to an order

issued by Hon. John Baxter, I return this writ without further proceedings hereunder."

On the same day, August 7, 1878, the plaintiffs in this suit, Steers & Co., filed their attachment bill in the state chancery court, claiming a mechanic's lien for the unpaid purchase money due them, and sued out an attachment, which, coming into the hands of the sheriff, was levied upon the leasehold and other property. Prior to the levying of this attachment, and on the eighth of August, Warinner, the attorney for Steers, had gone to the marshal (according to his testimony) to know of him whether he would, under the circumstances, persist in a sale, intending, he says, to enjoin Dawson if he did so persist. The marshal told him he had not determined, but would let him know. The marshal subsequently said to him: "I have removed my watchman; you can take the property and do what you please with it." He then notified the officer, and the attachment from the state court was levied. The marshal says, substantially, that he did not tell Warinner that he could do what "he pleased with the property," but only that "he had withdrawn his watchman." He further says that he did not intend to abandon his levy, but only to return his writ in accordance with the "order" of Judge Baxter, and proceed no further until instructions from the court could be procured. He says when he received the clerk's "order" he advised with Poston, the attorney for the execution creditor, and asked what he should do. Poston told him the "order" was unauthorized, and warned him not to abandon his levy; told him the leasehold was real estate, and it was not necessary to keep the watchman in charge; advised him to withdraw the watchman, as he would not guaranty the expense of keeping him, and return the writ, with a statement of his reasons for doing so, and await instructions from the court.

After the epidemic of 1878, by decree in the state court, Daniel was put in possession as a *quasi* receiver, and authorized to work the press. On November 22, 1878, he executed to Warinner a trust deed to secure Steers & Co., and on same day a trust deed to the defendant Freeman, to secure his sis-

ters and other creditors. These all convey the leasehold and the press. At the November term of this court, in the case of *Dawson* v. *Daniel*, the motion for a new trial was overruled, and the plaintiff moved for a *venditioni exponas* to compel the marshal to proceed with his levies. Daniel, the defendant, resisted this motion, filed an affidavit, exhibiting Judge Baxter's letters, and the "order" of the clerk, and stating the facts relied on to show an abandonment of the levies by the marshal, and insisted that the *venditioni exponas* should not issue—*First*, because the *fieri facias* had issued prematurely, and was void; *second*, because the levies had been abandoned by the plaintiff and the marshal. The court, on February 8, 1879, granted the motion of the plaintiff, and ordered a *venditioni exponas* to issue.

On February 12, 1879, Steers & Co. removed their bill from the state court to this court, and thereupon moved for an injunction against Dawson, who was a party to the bill, to prevent a sale under the *vend. ex.* and for a receiver. Freeman, the trustee for creditors, then filed a cross-bill, claiming the property as against Dawson upon the ground of abandonment, and that the execution was void because issued prematurely. Daniel's three sisters also filed a cross-bill, claiming that Daniel had used their money, left in trust with him, in purchasing the property, and they set up a resulting trust; and Steers & Co. filed a supplemental bill claiming also under their deed of trust to Warriner.

By agreement of all the parties the marshal was made provisional receiver, and, pending the controversy, a private sale was negotiated for $30,000, which was approved by the court, and an agreed decree entered requiring $6,000 to be deposited in court to satisfy Dawson's judgment, if he had a better title than Freeman, and the balance was paid in discharge of Steers & Co.'s claim and that of the three sisters. By this arrangement these latter claims are out of the way, and the only question is whether Dawson or Freeman, the trustee, has the better title to the $6,000.

*Gantt & Patterson* and *Metcalf & Walker*, for plaintiffs.

*Humes & Poston* and *Lowrey Humes*, for defendant Dawson.

HAMMOND, D. J. This case is to be decided upon the issues made by Freeman's cross-bill, and stands as if he had enjoined further proceedings upon the *venditioni exponas.* If a sale had taken place under that writ, Dawson, the execution plaintiff, would be entitled to the money, no matter what kind of a title had been conveyed. *Hutchman's Appeal,* 27 Pa. St. 209. On the other hand, Freeman can claim nothing under the Steers writ of attachment, and it is immaterial how the case would stand as between Steers and Dawson, or what would have been the result of a controversy between the marshal and the sheriff on the facts of this case. Happily, that controversy is out of the way.

The facts as to the sheriff's levy are only important as throwing light on the question of abandonment by the marshal. Freeman claims that the levies were abandoned at the time the deed of trust was made to him, if not as to the leasehold, certainly as to the machinery, which he claims was personal property, whether the leasehold was or not, and that as to neither did the marshal keep up that dominion and control which the law requires to perfect Dawson's title. It does not lie in the mouth of Daniel, or any one claiming under him with notice, to predicate upon the conduct of the marshal any claim of abandonment. If it was an illegal and unauthorized act of the judge, the clerk, or the marshal to suspend proceedings, it was a fraud on Dawson for Daniel to procure the suspension, and he can take no advantage of it. If the acts of the judge, the clerk, and the marshal were valid, the "order" did no more than suspend proceedings where it found them. An injunction may have operated to release the levy, but not such a proceeding as that. *Bisbee* v. *Hall,* 3 Ohio, 449. Freeman's conveyance was made while the proceedings were pending. The marshal's return disclosed the levy, and precisely how and in what manner it was suspended; and, moreover, Daniel was in possession as receiver under this Steers bill, to which Dawson was a party. Freeman could not, therefore, be a purchaser without notice, even if he can be treated as a purchaser for value at all, where the trust is to secure antecedent debts. However the conduct of

v.4,no.7—38

the marshal might be construed in the case of a subsequent execution creditor, Daniel cannot claim it to be an abandonment, and Freeman occupies no better attitude in filing the bill.

I adhere, however, to the opinion expressed in the case of *Dawson* v. *Daniel*, 8 Cent. Law J. 185, that, in a strictly legal contest over this title, the facts show no such abandonment as will defeat the title of Dawson, and that without reference to any equitable consideration above mentioned. The question of abandonment is to be tested, not so much by what the marshal did, as by what he was required to do. If, for example, the placing a watchman in charge was unnecessary, his withdrawal cannot be an abandonment. The marshal was evidently trying to hold on to his levies, and all he did must be interpreted in the light of that intention. Yet, if the legal effect of his conduct was an abandonment, his intention to hold on cannot save the levies.

Let us first consider the question without reference to the disputed point whether a leasehold is real estate, and without regard to the "fixtures." Precisely how a sheriff "seizes" or "takes in execution" a term for years, it is difficult to say from anything that has come under my observation. In Pennsylvania, although a leasehold was personal property, and was sold as such, no deed or condemnation being required, as in the sale of lands, it was levied on and sold in the same manner as real estate, the sale and return of the sheriff operating to pass title. *Williams* v. *Dowling*, 18 Pa. St. 60; *Sowers* v. *Vie*, 14 Pa. St. 99; *Dalzell* v. *Lynch*, 4 W. & S. 255.

I take it the same method is proper in Tennessee. *Thomas* v. *Blakemore*, 5 Yerg. 113. I understand that to have been only a paper levy, and it was held that neither a deed nor registration was necessary. It is said in Freeman on Executions that, as to personal property, there must be something more than a mere pen-and-ink levy. Section 260. But this cannot apply to leaseholds, for they are incapable of anything else, and it is everwhere held that where the property is incapable of manual delivery, or is ponderous and immovable,

these facts must be held to modify that dominion and control which the officer must keep up.  Id. § 262a, 263, 280.

In England an assignment of the term was necessary to complete the sale, because of the statute of frauds, and without it the sale was void.  Everywhere it was held that the purchaser must bring his ejectment to obtain possession.  It was so under the statute of *elegit*, which commanded the sheriff to deliver all the goods and chattels and one-half the lands to the plaintiff.  And it was so under the *levari facias*.  Under the *elegit*, the plaintiff could treat the leasehold either as chattels, and take the whole at a price, or as lands, and take one-half by extent.  The sheriff could enter, if he found the gates and door open, to hold his inquisition, but for no other purpose.  If he delivered the term as chattels, or extended one-half as lands, all the tenant, by *elegit*, could do was to bring ejectment.  So, under the *fieri facias*, all the sheriff did was to sell and assign the term, and the purchaser was put to his ejectment to obtain possession.  There was one exception only to this, and that was, if the execution debtor consented to surrender possession the sheriff might put his purchaser and assignee in possession under the *fi. fa.*; but he could not do this by force.  If he happened to find the tenant absent he could not seize the possession against his will, for that would be taking forcible possession, which was not allowed.  Perhaps the purchaser, if he could get possession, might, relying on his title, retain it under such circumstances, but this principle would not authorize the sheriff to eject the debtor.  Watson, Sheriff, 178, 188, 206, 212, (5 Law Library, 128, *seq.*;) Sewell, Sheriff, 226, (36 Law Library, 175;) 2 Saund. 68, 70, 3 Bac. Ab. tit. "Execution," c. 4, p. 699, (Bouvier's Ed. A. D. 1860;) Id. c. 2 p. 688; 5 Id. tit. "Leases," p. 433; Taylor's Landlord and Tenant, § 435; *The King* v. *Dean*, 2 Show. 88; *Taylor* v. *Cole*, 3 T. R. 292; *James* v. *Brawn*, 5 B. & Ald. 243, (7 E. C. L. 83;) *Hughes* v. *Jones*, 9 Mees. & Wels. 372; *Playfair* v. *Musgrove*, 14 Mees. & Wels. 239; *Rogers* v. *Pitcher*, 6 Taunt. 207; and see *Porter* v. *Cocke*, Peck R. 34, (Tenn.)

I am of opinion, therefore, that, in making a levy on a

leasehold, even where it is taken as *a chattel interest in real estate*, the sheriff cannot oust the tenant in possession or the execution debtor without his consent, and that he cannot, in the nature of the thing, be required to exercise any dominion or control over it, founded on any idea of a right to the possession. He should, no doubt, proclaim his levy to those in charge, and notify the tenants of it; but, strictly speaking, I do not find that even that is necessary to maintain his levy. That which the marshal did in this case was abundantly sufficient. He had no right to put a watchman on the premises, nor to remain on them himself without the consent of Daniel; and, his presence not being necessary to symbolize his title under the levy, his withdrawal was no abandonment, neither was he required to watch and warn off trespassers, whether they came as officers with writs or otherwise.

In *Very* v. *Watkins*, 23 How. 469, 474, it was said, even of a box of jewelry, that if the officer had a view of it, and it is in his power, he need not take actual possession, but may declare his levy without actual seizure. If any one disputes his title he may retake the property wherever he finds it. *Parrish* v. *Danford*, 1 Bond, 345. On the theory, then, that the marshal was required to levy on the leasehold as goods or chattels, his levy was complete and his title good, and he could at any time have made an actual seizure, if it became necessary. It was in his constructive possession, and that was enough. The sheriff, on that theory, was a trespasser. Owing to comity between the courts the marshal would, perhaps, not be able to turn him out without an application to the state court itself, but the sheriff's wrongful possession did not displace the marshal's levy. His levy was notorious and sufficient, and the nature of the property was such that he could not and need not take any kind of actual possession. Neither the withdrawal of the watchman nor the entry of the sheriff can, therefore, be treated as an abandonment by the marshal of his title. The fallacy of the plaintiff's position is in supposing that to make or hold a valid levy the marshal should place a watchman in charge, or do some such significant act to manifest and keep up a manifestation of his

title; or that, having assumed to do this in the beginning of his levy, a subsequent neglect to do it is an abandonment. So far as his acts were excessive, he might cease such excess without incurring any imputation of abandonment. He could not legally have forbidden the entry of the sheriff, because, as we have shown, he had no right to the possession of the leasehold lot, and an action of ejectment was necessary to recover that possession. The coerced return of the writ was no abandonment, and all along the marshal had all the dominion and control that he lawfully could have acquired by his levy in the first instance.

Does the case stand any differently as to the machinery? If it be conceded that the machinery is to be treated as personal property, regardless of its annexation to the land, yet, owing to the fact that it was fixed to the soil, was ponderous, and incapable of manual delivery without a severance from the soil, the marshal did all he could do to make an effectual levy, and to keep it up, as I have already shown by the authorities last cited. See, also, *Gladstone* v. *Padwick*, L. R. 6 Exch. 203. It is undoubtedly true that the officer may remain on the premises where the goods he takes are situated long enough to remove them, but I think he was not required to tear down this machinery and remove it. Except for that purpose he had no right on the lot at all after he had declared his levy. He might well let it stand as he found it; until the sale, at least.

But I cannot assent to the theory that, with such machinery as this, an officer with an execution can sever it and sell it separate and apart from the leasehold. It might not pass under a levy on the leasehold alone, and as a part of it; but that is not the question. He levied on it by name as machinery, and likewise on the leasehold, and the real question is whether he should have severed and sold; or, rather, that being his duty, whether his failure to do it was an abandonment. I am satisfied his duty was to levy, as he did, on both, and sell both together, in precisely the condition the lessee had placed it; otherwise, this valuable machinery, costing many thousands of dollars, would be unnecessarily

impaired in value by severance, and so would the leasehold. The value of each is enhanced by keeping them together.

It is sometimes loosely said in the books that whatever the tenant can remove must be levied on and sold as personal property. This may be so as to mere utensils of trade, or trade "fixtures," which are portable, and not seriously injured or rendered useless by severance. But not so as to structures like this. No doubt the press is valuable when severed, and can be placed on other land, but the mere cost of taking down and putting up is so great, that its value standing and ready for work is far greater, and it cannot be that a debtor can be compelled to submit to a mode of levy and sale which so deteriorates his property. If so, it could be severed and sold on an execution for any small amount. Take the case of buildings built on leasehold land with a covenant for removal. Can it be said that they must be severed and sold by the sheriff, rather than sold all together? It does not follow because the leasehold, or the structures upon it, are personal property, and are sold as such, that they are to be treated as loose or portable chattels, or that the structures are to be severed to make them so. Both being chattels, it may, in a proper case, be sold as a whole; and, if the leasehold be real estate, in the hands of the lessee, the fixtures on it must be real estate, as between him and his creditors, just as they would be if his estate was freehold. Perhaps the true theory is that the fixtures, when of a character to be real estate, if the owner has a freehold in the land, are also real estate if he has only a leasehold with a right of removal, and that it is the right of entry, severance, and removal which is levied on and sold. But the purchaser, if the leasehold can also be sold, buying that, has the same right to let them remain as they were, until it suits his pleasure or interest to remove them, as the lessee or execution debtor had. And, in this view, it is immaterial whether they be real estate or chattels, and I think the sheriff, in a case like this, whether he sells as real property or chattels, should sell all together.

It is not necessary to extend this opinion by reviewing the cases here cited which have led me to this conclusion. Cases

on the subject of fixtures are so numerous, differential, and conflicting that it is quite impossible to find authoritative precedents for any case. It has been frequently said that each must be governed by its own circumstances. The ruling I make here is only that, in a case like this, the machinery must be treated as a part of the leasehold, whether it be real estate or personal property; and that no other duty was required of the marshal in making and keeping up his levy on the machinery than was required in making and keeping up his levy on the leasehold; and, therefore, the levy on the leasehold not having been abandoned, the levy on the machinery was not abandoned by the acts relied on to show such abandonment. Ewell, Fix. 353, 357; Tyler, Fix. 159, 164, 192, 240, 416, 626; Freeman, Ex. § 114; Watson, Shff. 179; *Van Ness* v. *Packard*, 2 Pet. 137; *Kutter* v. *Smith*, 2 Wall. 491; *Gue* v. *Tide-water Co.* 24 How. 257; *Elwes* v. *Mawe*, 2 Smith, Leading Cases, (7th Ed.) 177, 212, 220, 222; *Pemberton* v. *King*, 2 Dev. Law, 376; *Conkling* v. *Foster*, 57 Ill. 104; *Pillow* v. *Love*, 5 Hayw. 109; *De Graffenreid* v. *Scruggs*, 4 Humph. 451; *Childress* v. *Wright*, 2 Cold. 350; *McDavid* v. *Wood*, 5 Heisk. 95; *Cannon* v. *Hare*, 1 Tenn. Ch. 22, 25; *Boydell* v. *McMichael*, 1 Cromp. Mees. & Ros. 177, note *a*, p. 180; *Hallen* v. *Runder*, Id. 266, 275; *Stewart* v. *Lombe*, 1 Brod. & Bing. 506; S. C. 5 E. C. L. 768; *Barnard* v. *Leigh*, 1 Stark. 27; S. C. 2 E. C. L. 217; *Doty* v. *Gorham*, 5 Pick. 487; *Potter* v. *Cromwell*, 40 N. Y. 287; *Murdock* v. *Gifford*, 18 N. Y. 28.

Moreover, I am of opinion that, in Tennessee, leasehold interests are now real estate so far as concerns judgments and executions, and that this judgment was a lien upon this property. The cases already decided in Tennessee settle this principle, though none of them are cases of execution levies. Section 51 of the Code says that the words "real estate," "real property," and "land" include lands, tenements, and hereditaments, and all rights thereto and interests therein, equitable as well as legal. T. and S. Code, § 51. We have seen that under the statute of *elegit* leaseholds were held to be included in the words "*medietatem terræ suæ.*" *Porter* v.

*Cocke,* Peck, R. 34; 1 Sug. Vend. 660; 2 Tidd, Pr. 1035, 1004; 5 Bac. Ab. title, "Cases," 433; Watson, Sheriff, 207. In *Evans* v. *Roberts,* 5 Barn & Cress, 828, (S. C. 11, E. C. L. 701,) it is said that in the English statute of frauds the words "lands, tenements, and hereditaments" were used to denote a fee-simple, and the words "any interest in or concerning them," to denote a chattel interest, or any interest less than fee-simple. These are almost the words of section 51 of the Tennessee Code.

It will be found, in examining the subject, that ever since lands in the colonies were subjected to execution there has been, particularly in the colonial and earlier state legislation, a disposition to assimilate leaseholds, at least for long terms, to real estate. The courts sometimes construed the words "real estate" and "lands" to include them, but generally it was held those words did not. Many of the states have, by statute, made them real estate, and there is nothing novel in so treating them. This section of the Code, in my opinion, was intended especially to make leaseholds subject to the incidents of real estate where the statute does not otherwise particularly direct. The case of *The People* v. *Westervelt,* 17 Wend. 674; S. C. 20 Wend. 416; and *Putnam* v. *Westcott,* 19 J. R. 73; and the cases cited in Freeman on Executions, § 119, and other text writers,—show the growth of legislation and judicial decision in this direction of making leaseholds real estate.

In *Barr* v. *Graves,* 11 Central Law Journal, 471, the supreme court of Tennessee held that a leasehold, with its machinery and fixtures for cleaning cotton, could be seized under attachment without going on the premises or taking possession of the property. It is true, the attachment was to enforce a statutory mechanic's lien, but the procedure would be the same, as I have endeavored to show, at common law, and without any lien. Indeed, our method of selling real estate under execution finds its archetype in the common-law mode of selling a leasehold under the *fieri facias, elegit,* and *levari facias.* The case cites with approval *Kelly* v. *Schultze,* 12 Heisk. 218; *Choate* v. *Tighe,* 10 Heisk. 621; and *Pemberton* v. *King, supra.* Mr. Justice Cooper was

one of the authors of the Code, and in delivering this opinion clearly points to the inevitable result that, as to judgments and executions, leaseholds are now real estate. But see *Buhl* v. *Kenyon*, 11 Mich. 249, where a contrary doctrine is asserted, under a similar statute, by a court entitled to the utmost respect.

In the view I have taken of this case it is unnecessary to examine the question so much argued, whether the adjudication of these questions in *Dawson* v. *Daniel, supra,* on the application for a *vend. ex.,* is *res adjudicata* of the questions now made by this bill. I think it was not such an adjudication as precludes either Daniel or those claiming under him from resisting the title of the execution creditor in any appropriate way. The only question there was whether a *vend. ex.* should issue, and that proceeding could not be converted into a trial upon affidavits of the right of property. It was a bare motion, from which not even a writ of error could be sued. *Boyle* v. *Zacharie*, 6 Pet. 656.

Let decree be entered declaring that Dawson is entitled to the money, and, after paying the costs of the suits at law, including the marshal's commissions for sale, the balance may be paid to him. The costs of the original and supplemental bills having been already paid out of the funds, the costs incident to the cross-bills, and all costs since the agreed decree, will be paid by Freeman out of the funds in his hands as trustee. But all the parties may have a decree for their costs against Daniel.

Decree accordingly.