834

## UNITED STATES DAILY PUB. CORPORATION v. NICHOLS.

Court of Appeals òf District of Columbia.
Submitted April 4, 1929. Decided
May 6, 1929.

No. 4736.

Guy Mason, of Washington, D. C., for plaintiff in error.

Wm. E. Leahy, of Washington, D. C., for defendant in error.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice: Writ of error to the municipal court to review a judgment for defendant in error (plaintiff below) for $89.25, the aggregate difference in wages between $1.10 and $1.28⅘ an hour for the period from March 3, 1926, to June 3, 1926.

The facts as disclosed by the agreed statement of the case are substantially as follows: At least since 1882 nearly all of the journeymen printers of the District of Columbia have been members of the International Typographical Union, with a local branch known as "Columbia Typographical Union No. 101." The laws of the International Union govern the local union. Under those laws none but a union member can be the foreman of a shop employing union men, and the shop must have at least one foreman. He represents the publisher or proprietor in employing printers and allied trades, such as stereotypers and pressmen. With few and special exceptions, a union printer may not work with a nonunion printer. Proprietors of shops employing union men also must permit the organization in the shop of a so-called "chapel," the smallest unit of organization within the union.

Under union laws the chapel takes up all matters of dispute between the employer and union employees, except fixing wage scales and the hours of employment. Only the union may negotiate wage scales and fix the minimum wage for which union printers may work. The minimum wage having been fixed by the local union, no individual printer may accept a wage less than the minimum wage, and no publisher or printer of any shop may demand a union printer to work for less than that minimum wage. The matter of the minimum wage is so governed by the local union that upon employment a union printer knows what he will receive as a minimum wage, and the publisher or proprietor knows what he must pay, without any negotiation as to the amount, except in the event that the publisher or proprietor and individual printer may agree upon a wage higher than the minimum wage.

For many years the local unions throughout the country have effected wage agreements with publishers with whom they have had contractual relations as to wages, hours of labor, conditions of work, etc. Each wage agreement has been declared by the local union to be, and accepted by all publishers in those localities employing union help as, the "adopted wage scale" of such localities, and as such became the minimum wage scale. As already indicated, all publishers employing union printers were compelled to pay that scale to all union printers working in their shop. No union printer might work for less, even though the publisher seeking his employment had no agreement with the particular local union.

This understanding between the local unions of the localities throughout the United States and the publishers and proprietors of newspaper establishments was known generally in such localities "among all the publishers therein, and by all Local Unions for a great number of years, so much so that it was the custom of the Union printing trade throughout the country to receive, so far as the Union printer was concerned, as a minimum wage, the adopted wage thus determined, and so far as the publishers or proprietors were concerned, to pay that wage as a minimum wage whether the publisher or proprietor had an agreement with the par-

ticular Local Union of that particular locality or not."

The publishers of newspapers in the District of Columbia have maintained for a number of years an organization known as the "Publishers' Association of Washington, D. C." Plaintiff in error was not a member of that association. In the District since 1882 the adopted wage scale has been the scale agreed upon by the local union and the Publishers' Association of the District, whether the scale was established by conciliation or arbitration between the Publishers' Association and the local union.

Thirty days prior to November 11, 1923, the local union gave due notice to the Publishers' Association of a desire to reopen the scale of wages theretofore adopted and then in force. The period of conciliation or arbitration extended from November 11, 1923, to February 21, 1924, during which period "neither the Publishers' Association or any other publisher of a newspaper in the city of Washington, nor the Union employees themselves, knew what the rate of pay was going to be, and necessarily awaited the result of the conciliation or arbitration which might fix that rate." This had been the custom under which old scales had been terminated and new scales had been adopted in the District since 1882. The new scale was fixed on February 21, 1924, effective as of November 11, 1923. The new scale was to continue at least for one year from its effective date, November 11, 1923, and longer unless changed by either party giving notice, 30 days prior to any succeeding November 11th, of its desire to open the scale for adjustment as before.

Thirty days prior to November 11, 1925, the local union gave the Publishers' Association notice that it wished to negotiate a new wage scale. Accordingly, the local union and the Publishers' Association appointed a wage committee, and negotiations were begun. The old wage scale then was "open," pending the result of the negotiations thus instituted.

" 'Open' meant that temporarily there was no adopted wage scale in force; that a prior one had been questioned by either the Local Union or the Publishers' Association; that the printers were working provisionally and temporarily under the old wage scale, but the scale had not yet been closed or settled; that negotiations had been opened to fix and close a new scale but that, pending its determination, the old scale, thus opened up, would be paid provisionally and temporarily until a new adjustment was reached; in the event the new scale increased the wages of the printers over the old scale theretofore terminated and opened up, the publishers would be compelled to pay to the printers the increased scale; if the new scale of wages were lower than the old, the excess paid to the printers in the meantime, between the date the old scale was opened up and the new one was closed, would be refunded by the Local Union. * * * Whenever determined and fixed, the new scale became the adopted wage scale as a minimum wage to be paid by all publishers employing union printers in the District of Columbia, whether members of the Publishers' Association or not. This custom * * * had been in force, as the testimony disclosed, generally, throughout the printing trade in the City of Washington, since 1882. All publishers knew how that wage was fixed, and whether fixed by conciliation or arbitration between the Publishers' Association and the Local Union, it became the adopted minimum wage scale to be paid by all, whether members of the Association or not.

"Pending the result of the negotiations for a new wage scale, both parties respectively received and paid the old scale which had been in force, in order to avoid labor disputes and troubles, and that it might benefit the one by having its publications published and the other by receiving wages pending the result, with the result that the testimony disclosed, since 1882 there has never been a strike in newspaper shops in the District of Columbia employing union men, and there never has been an open newspaper shop, i. e., one employing other than union help in all that period."

Some time in March, 1926, the respective committees of the local union and the Publishers' Association, finding it impossible to agree upon a new wage scale, terminated their negotiations, and referred the matter to Mr. Justice Hitz, of the Supreme Court of the District of Columbia, for arbitration. He made his award on May 24, 1926, effective as of November 11, 1925. "The award was immediately accepted by both parties, the Union and the Publishers' Association, and became the adopted wage scale in the District of Columbia for one year from November 11, 1925, and thereafter, unless and until reopened by either party after giving thirty days' notice to reopen and resettle the same by negotiation or arbitration. The award of Mr. Justice Hitz increased the wage scale from $1.10 an hour to $1.28$\frac{4}{7}$ an hour as of November 11, 1925."

In December of 1925, plaintiff in error was incorporated for the purpose "of pub-

lishing each day, except Sundays and legal Holidays, in newspaper form, a chronicle of Federal government activities." This publication was called "The United States Daily."

"Immediately after incorporation, Mr. Lawrence and his associates, of whom Mr. John E. Rice was one, began the work of organizing the several departments necessary to launch such a publication. Mr. Rice, like Mr. Lawrence, was an experienced newspaper man. In addition, he had had publishing experience, having been publisher, at one time, of the Washington Herald. ·

"Among the departments necessary to the printing and circulating of a publication such as that contemplated and eventually actually brought into being, was what is known in the publishing business as a mechanical department, consisting of typesetting machines, presses, stereotyping apparatus, and skilled printers and typesetting machine operators. To Mr. Rice, general manager of the corporation, was delegated the duty of getting this department together and ready for operation."

Mr. Rice was familiar with the union rules and regulations and "was familiar with the method and manner of fixing the minimum wage scale of printers in the District of Columbia. As Manager of 'The Herald' he had employed union help." Nevertheless, "he determined to open a Union shop. * * * One of Rice's first acts was to engage as foreman of the composing room Martin A. Olmem, who had worked with him, as foreman, on 'The Herald.' Olmem was a union printer and at the time of his employment was a member of the Local Union in Baltimore where he was employed on 'The Sun,' a daily newspaper in that city. * * * Olmem was thoroughly familiar with the rules and regulations of the union. He was thoroughly familiar with the manner by which the minimum wage scales were fixed by the Local Unions in various parts of the country. * * * He knew the method and manner by which the minimum wage scale was fixed and determined for union printers in the District of Columbia. Mr. Rice, immediately upon his employment of Olmem, authorized Olmem to employ printers and other necessary help. Rice knew Olmem was a union man, and both Rice and Olmem determined to employ union help and operate a union shop under union conditions. Accordingly, Olmem made it known among his associates on 'The Sun' that he was coming to Washington to start a newspaper, and several of his fellow printers made a request for employment. Olmem came to Washington about February 16, 1926, and immediately began to assemble his composing room. He went to the headquarters of the Local Union, upon his arrival here, at its Typographical Temple. He deposited his union card and immediately took out a membership again in the Local Union in the District of Columbia. He knew that the wage scale was 'open' in the District of Columbia as he had heard the fact discussed in the composing room on 'The Sun' in Baltimore between the printers in that room whose wage scale had been opened up at the same time. * * * " He advised the secretary of the Local Union "that he was about to open a union newspaper shop in this city, and left word with him, the Secretary, that he wanted union men."

Shortly thereafter, defendant in error, Nichols, who was known to Olmem as a union printer, asked for a job. Olmem employed defendant in error and about 20 other union printers. All these men began to work on or about the 3rd of March, 1926.

"The shop was organized as all shops which employed union men are organized. The printers organized a chapel in the shop. Both Olmem and Rice testified that they intended to and did open a union shop, and both admitted they were familiar with the rules and regulations of the union in regard to the organization, conditions of work, and wages governing union help. Olmem acted for and on behalf of the plaintiff in error in hiring the men under Rice's instructions. * * * He had the authority to employ the men and fix the amount to be paid them, as foreman of a union shop. Olmem knew that whatever union men he got to work for him in that printing establishment he had to pay them as a minimum wage that wage which was fixed by the wage scale declared in the contract between the Publishers' Association and the Local Union. He knew at the time he employed each and every one of the men the scale might go up or down. He knew that whatever they were to get, it was during a time of adjustment when the scale had been opened up, subject to being re-set by the award which was to be made. Under the union rules and regulations the foreman is the man to apply to for work in a union shop; not the proprietor or publisher of the newspaper. * * *

"Olmem said nothing to the defendant in error or any other of the men whom he employed, when he employed them, as to how much they were to be paid or at what scale they worked. He merely informed each and all of them, that he was opening a union newspaper shop in the City of Washington, and

the mutual agreement was struck to go to work in that shop with nothing said as to what the wage of any union printer was to be. Both Rice and Olmem testified they knew that they would have to pay each of the men the newspaper scale of wages prevailing in the District of Columbia. * * * Rice testified that when he authorized Olmem to employ the defendant in error and the other union printers he expected and intended to pay the prevailing newspaper scale of wages. He did not consider that he could open other than a union shop because of the difficulty in employing non-union help. After the men had been at work a week they were paid for their week's work at the rate of $1.10 an hour, and for every week thereafter until the week of June 3, 1926, the men, including defendant in error, were paid at the rate of $1.10 an hour. At no time prior to May 25, 1926, did the men, individually or collectively, complain of or make any objection to the price per hour they received as their wage."

After the award of Justice Hitz, a controversy arose as to whether defendant in error and other union printers employed by plaintiff in error were entitled to the increase from the date of their employment. Olmem finally notified the men "that plaintiff in error was not going to pay the men in accordance with the Hitz award because the same was too much and that the 'United States Daily' was not bound to pay it as it had no contract with the Local Union."

For almost half a century all publishers in the District of Columbia employing union printers have known of and acquiesced in a method by which wage scales have been adopted. During all this time it has been known that union printers were not permitted to work for less than the minimum scale; that if either party became dissatisfied with an "adopted scale" and gave due notice to the other party, the adopted scale became "open." From that time until a new scale was adopted, all publishers employing union labor had known that "pending its determination, the old scale, thus opened up, would be paid provisionally and temporarily until a new adjustment was reached; in the event the new scale increased the wages of the printers over the old scale theretofore terminated and opened up, the publishers would be compelled to pay to the printers the increased scale; if the new scale of wages were lower than the old, the excess paid to the printers in the meantime, between the date the old scale was opened up and the new one was closed, would be refunded by the Local Union."

Not only does the record show that this custom was universal among publishers employing union printers, but it shows, in addition, that plaintiff in error was fully advised of it when it employed defendant in error. So, we have not only a custom so old, notorious, definite, and uniform as to be binding on those within its purview (Shortsleeves v. Capital Traction Co., 28 App. D. C. 365, 375, 8 L. R. A. [N. S.] 287; Chicago, M. & St. P. R. Co. v. Lindeman [C. C. A.] 143 F. 946, 949; Van Ness v. Pacard, 2 Pet. 137, 147, 7 L. Ed. 374), but one admittedly known to plaintiff in error, and with reference to which plaintiff in error contracted.

When Nichols applied for a job, Olmem (plaintiff in error's authorized representative) knew that it was not only unnecessary to make any reference to the wages Nichols was to receive, but that such a reference would be futile, unless plaintiff in error was to pay Nichols more than the prevailing minimum wage. Nichols, knowing what he was bound to receive, naturally made no reference to wages. Both parties knew that the wage scale was "open" and that if it was increased the effective date of the increase would be the date when the previously adopted scale became "open"; that is, November 11, 1925. Under the clearly disclosed facts, Nichols had a right to assume that he would receive the difference between the amount that was "paid provisionally and temporarily" and the amount of the new award, if that award exceeded the old.

The foregoing custom by which union wages are fixed is reasonable, and calculated, as the record discloses, to make strikes and business interruptions unnecessary. If conditions change and a new wage scale is negotiated, there is no apparent reason why the effective date of the new scale should not be the date when the old scale was challenged.

Judgment affirmed, with costs.

Affirmed.