CHARLES F. CONRAD v. THE SAGINAW MINING CO.

*Mining lease—Trade fixtures—Right of removal.*

As between landlord and tenant of a mining lease, engines and boilers erected by the tenant on brick and stone foundations, and bolted down solidly to the ground, and walled in with brick arches; and dwellings erected by the tenant for miners to live in, standing on posts or dry stone walls piled together,—where such machinery and buildings were intended to be merely accessory to the mining operations under the lease, and when there was no intention in affixing them to the realty to make them accessory to the soil, and where they can be removed without material disturbance to the land, are regarded as "trade fixtures," and may be removed at or before the termination of the lease."[1]

Appeal from Marquette. (Grant, J.) June 3-4.—June 25.

INJUNCTION bill. Complainant appeals. Affirmed.

*F. O. Clark* for complainant. Whatever is affixed to the realty is thereby made a part of it: *Graham v. C. N. J. R. R. Co.* 10 Am. Rep. 61; *Murray v. Moross* 27 Mich. 203; but this may be avoided, by an agreement in writing, for a

---

[1] The head-note in this case is by Mr. Justice Champlin.

right of removal: *Crippen v. Morrison* 13 Mich. 24; otherwise, not: *O'Brien v. Kusterer* 27 Mich. 289; *Knowlton v. Johnson* 37 Mich. 47; *McAuliffe v. Mann* id. 539; but when the thing annexed or the mode of annexation is such that it cannot be removed without destroying it or removing the support of the realty it is an absolute fixture: 3 Wait's A. & D. 372; *Ford v. Cobb* 20 N. Y. 344; *Tifft v. Horton* 53 N. Y. 377: 13 Am. Rep. 537; *Coleman v. Stearns Mfg. Co.* 38 Mich. 30; *Morrison v. Berry* 42 Mich. 389; *Fryatt v. T. S. Co.* 5 Hill 116; *Ege v. Kible* 84 Penn. St. 333; *Green v. Phillips* 26 Gratt. 752; *Congregational S. of D. v. Fleming* 11 Iowa 533; *Palmer v. Forbes* 23 Ill. 301; *McLaughlin v. Johnson* 46 Ill. 163; *Heaton v. Findlay* 12 Penn. St. 304; *Whiting v. Brastow* 4 Pick. 311; where the question as to the removal of fixtures arises between landlord and tenant, it should always be ascertained whether they had executed the lease with covenants concerning fixtures: 3 Wait's A. & D., 372; this agreement must be in writing: 7 Wait's A. & D. 28, 29; *Hogsett v. Ellis* 17 Mich. 353, 375, 376.

*Hayden & Young* for appellee. The intention to annex or not determines whether an erection upon land becomes a fixture: *Stokoe v. Upton* 40 Mich. 582; *Wheeler v. Bedell* id. 696; *Robertson v. Corsett* 39 Mich. 779; *Seeger v. Pettit* 77 Penn. St. 440; *Hubbell v. East C. R. R.* (Mass.) 42 Am. Rep. 446; *Bewick v. Fletcher* 41 Mich. 626; *Hey v. Bruner* 61 Penn. St. 90; *Heffner v. Lewis* 73 Penn. St. 302.

CHAMPLIN, J. In the year 1871 David W. Allison and Edmund Heather were owners of certain wild land in section nineteen, township forty-seven north, range twenty-seven west, in Marquette county; and on the ninth day of September of that year they made and executed a lease to Nicholas Lonstorf, John B. Maas and John P. Mitchell, as follows:

"This indenture, made this 9th day of September in the year one thousand eight hundred and seventy-one between David W. Allison, of Saginaw city, Mich., and Edmund Heather, of Saginaw city, Mich., parties of the first part, and Nicholas Lonstorf, John B. Maas and John P. Mitchell, of Negaunee, Michigan, parties of the second part,

Witnesseth, that the said parties of the first part, for and in consideration of the rent, covenants and agreements here-

inafter mentioned, reserved and contained on the part and behalf of the parties of the second part to be kept and performed, doth grant and convey unto the said parties of the second part and their assigns the right of entering in and upon the lands hereinafter described, for the purpose of searching for iron ore, and of conducting mining and quarrying operations to any extent they may deem advisable, for the term of fifteen years from the first day of October, in the year one thousand eight hundred and seventy-one. The said lands are situated in the county of Marquette and State of Michigan, and are known and described as follows: The west half ($\frac{1}{2}$) of the northeast quarter ($\frac{1}{4}$), and the northwest quarter ($\frac{1}{4}$) of the southeast quarter ($\frac{1}{4}$) of the northeast quarter ($\frac{1}{4}$) of the southwest quarter ($\frac{1}{4}$), and the southeast quarter ($\frac{1}{4}$) of northwest quarter ($\frac{1}{4}$) of section nineteen (19), in township forty-seven (47) north, of range twenty-seven (27) west.

And the said parties of the second part hereby agree that they will pay or cause to be paid unto the said parties of the first part the sum of fifty (50) cents a ton for every ton of 2240 pounds of iron ore mined by them on said land, and by them shipped, sold or used. And it is agreed that settlement shall be made between the parties hereto on the first day of April and on the first day of October of each year of said term. And in such settlements the railroad receipts shall be used in ascertaining and determining the number of tons shipped, and payment shall be made at said times for all ore shipped, sold or used during the six months preceding the time of payment.

And it is further agreed that the said parties of the second part shall pay to the said parties of the first part the royalty or price of five thousand tons of ore mined on said land each and every year during the existence of this lease.

This lease may be terminated by said parties of the first part at any time within six months after any October first, after the month of October in the year one thousand eight hundred and seventy-three, in case the production of ore, during the twelve months ending at said date, and on which royalty is payable, shall not exceed five thousand tons(5000). Notice of such election shall be given to said parties of the second part, and the lease shall thereupon terminate on the first day of April next ensuing: Provided, however, that if the production of any year shall fall short of five thousand (5000) tons, said parties of the second part may save a forfeiture by paying royalty on that amount, and they shall be

entitled to mine in succeeding years without paying royalty thereon as many tons as they shall have paid the royalty upon without having mined the same in former years. But this shall only be done in case they shall, during each succeeding year, also mine in addition (or pay a royalty upon) said minimum amount of five thousand tons.

It is hereby expressly agreed and understood that the said parties of the second part shall not be and are not liable to pay any royalty upon ore which shall not be actually mined and sold, shipped or used until the year commencing with October first, one thousand eight hundred and seventy-two. The provisions of this lease relating to payment of royalty upon five thousand tons each year, whether the same shall be mined or not, shall not be in force and shall not apply during the first year of said term, to-wit: from October 1st, 1871, to October 1st, 1872; but the parties of the second part shall pay a royalty upon all ore actually mined and shipped, sold or used during said first year. The parties of the first part agree to pay all taxes, general or special that may be assessed upon said land; and in case said first parties shall not pay the taxes when due, said parties of the second part may pay the same, and the sums so paid shall be charged to said parties of the first part, and may be deducted from any sums of money due from said second parties to said first parties. In case any other ore or mineral besides iron ore shall be discovered on said land, this lease shall apply to the same, except that no royalty shall be paid upon any such other ores or minerals unless the same shall be actually mined and shipped, used or sold, and the royalty to be paid on such other ore or mineral shall be in the same proportion, as to the value thereof, as by this lease is to be paid for iron ore.

The said parties of the first part hereby give the right to the said parties of the second part to use all the wood and timber standing on said lands as shall be necessary for mining purposes, and to erect such buildings and machinery upon said land, and to lay such railroad tracks and tramways, and make such other roads as may be necessary and convenient for mining purposes, and to use therefor any timber that may be standing upon said land.

And the said parties of the first part hereby covenant and agree that they will not suffer or do any act or thing which shall impair or annul the full effect of this lease; and they will warrant and defend said parties of the second part, their heirs and assigns, in full and peaceable possession of said demised premises against the lawful claims of all persons.

In witness whereof, the said parties hereto have set their hands and seals the day and year first above written.

|                      |         |
|----------------------|---------|
| DAVID W. ALLISON.    | [Seal.] |
| NICHOLAS LONSTORF.   | [Seal.] |
| JOHN B. MAAS.        | [Seal.] |
| JOHN P. MITCHELL.    | [Seal.] |
| EDMUND HEATHER.      | [Seal.] |

Signed, sealed and delivered in presence of
    M. H. CROCKER,
    TIMOTHY RYAN,
    C. F. CONRAD,
as to signatures of Allison, Lonstorf, Maas and Mitchell.

Signed, sealed and delivered in presence of
    I. MAMZER,
    F. G. BROWN,
as to signature of Edmund Heather."

Under this lease Lonstorf, Maas and Mitchell went into possession and mined for iron ore thereon until December, 1872, during which time they erected a few buildings and some machinery for mining purposes. The land was mostly swamp and woods, and was of small value except for mining purposes, and at the time the lease was executed there were no buildings or improvements thereon. In April, 1872, the complainant, who previously had held an equitable interest, acquired by deed from the owners named, an undivided one-sixth interest in the land in question. In December, 1872, the defendant by purchase and assignment became possessed of all the rights of Lonstorf, Maas and Mitchell under the lease, and of all the buildings and machinery placed on the land by them up to the date of the assignment; and defendant thereafter operated the mine on the land up to October, 1882, when it ceased operations, claiming that the ore was practically exhausted in the mine and that it would not pay to keep the pumps going or the men at work. After defendant purchased, in 1872, it removed nearly all the machinery which had been used by the lessees, and replaced it with a heavier and more expensive kind, and at various times down to the suspension of active operations in 1882, it repeatedly removed some portions of the machinery, replac-

ing it or not as its own convenience or necessity required, all of which in a general way was known to complainant who made no objection.

Various engine and pump-houses, as well as temporary residences for miners, were also erected upon the land by defendant from time to time as its convenience or the necessities of mining operations required; some of which—the engine and boiler houses—were very substantially built, the beds for engines being built of solid masonry; but all the erections for supporting and sheltering machinery were required by the nature of their use to be substantial in order to be useful.

The dwellings, to the number of 35 or 40 in all, erected at different times, were mostly of a very temporary kind, very cheaply built, a large proportion being built of logs at an expense of $75 to $150 each, and fourteen or fifteen were frame, costing $500 to $1000 each. Some were set on posts and some on dry stone walls piled together, and all now nearly worthless. All erections, whether of machinery or buildings, were made and paid for by defendant exclusively for "mining purposes," and were used for no other purpose, though capable of being used at other mines. The total cost of all machinery and buildings placed on the land by defendant at different times was from $50,000 to $60,000.

After the defendants had ceased to operate the mine under the claim stated, they notified complainant of their abandonment of mining operations and of their intention to remove their plant and property from the land leased, and offered to sell the same to the owners of the land if they desired to purchase. Complainant entered into negotiations for the purchase thereof, but without concluding the same, filed his bill of complaint, stating as follows:

"That under the provisions of said mining lease buildings have been erected upon said property in a very substantial manner, and have become fixtures to the freehold. There has also been erected solid brick and stone foundations upon which have been placed large engines, which have been bolted down solid to the ground. There has also been placed in

brick arches large boilers connected with said engines, which have been walled in with brick in said arches built from the ground, and bolted down in the most substantial manner, which brick and stone foundations and arches and engines and boilers have become fixtures to the freehold and a part of the realty; that they were erected upon said property by agreement under said lease, but there was no agreement whatever in said lease permitting the removal of the same upon the surrender of the lease or the expiration of the same, or at any other time, so as to lessen the value of said property and to dismantle said mine and deprive it of its proper equipment of machinery and buildings so permanently affixed to the property;" and praying therein "that said defendant, its servants, agents and attorneys, may be restrained by the injunction of this court, and be decreed to forever desist from tearing up and removing said permanent fixtures, except upon replacing the same with as good at the time of the removal, and not to tear up or remove unless the successful working of said mine shall require it, and upon replacing the same with machinery of at least equal value."

The question involved is whether the machinery and buildings placed upon the land have been so affixed to the soil as to become part of the realty so as to preclude the defendant from removing them at or before the termination of the lease. It was conceded that the machinery in question was of the character denominated "trade fixtures," and that the intention with which they were annexed as well as the purposes for which they were used, would have a material bearing upon the case. Consequently a large part of the testimony was directed to the manner in which the property had been assessed for taxes; complainant claiming that the property in dispute had generally if not wholly been assessed as real estate, and under the provisions of the lease, been paid by the owners of the land. On the other hand the defendant's evidence tended to show that the property in question had always been assessed as personal property to the defendant, and it had paid the taxes levied thereon. The complainant testified to the custom in that vicinity of inserting clauses in mining leases giving tenants the right to remove fixtures, but the instances within his knowledge were all subsequent to the time when this lease was executed. The

defendant showed by one witness that the custom testified to by complainant was not universal, and that during a residence of seventeen years in the county it had always been the custom, with every lease he ever had any knowledge of, for the lessees to have the privilege of removing the machinery, or any personal property erected thereon.   The evidence of custom introduced by both parties is not sufficient to afford any assistance in the construction of the contract between them, or in determining the question before us, and must be laid entirely out of view.

The rights of the parties must be determined from the lease existing between them, in connection with the nature and use of the property, and the intention of the tenants in making the annexation.   While there are certain general principles applicable to all cases arising between landlord and tenant as to what annexations are removable and what not, yet each case must in a great measure depend upon its own peculiar circumstances, and the intention of the party, and the time and manner of making the annexation, which will be of controlling influence in the correct disposition of the questions involved.

It will be noticed that the lease contains no clause reserving the right of re-entry in case of condition broken or failure to perform the covenants by the lessees, and that it entirely omits the clause usually contained in leases requiring the lessees at the expiration of their lease to yield up the premises in good repair.   The lease contains no stipulation as to whether annexations made during the term shall remain or may be removed.   The effect of the omissions is to leave the question of intention to be gathered from the stipulations the parties saw fit to embody in the contract between them, in connection with what they have done in the execution thereof.   At the time the contract was entered into the mine was undeveloped, and there might or might not be ore found in sufficient quantities to warrant mining operations.   The grant was to the parties of the second part and their assigns of the right of entering upon the lands for the purpose of searching for iron ore, and of conducting mining and quarry-

ing operations to any extent they may deem advisable for the term of fifteen years; and the further right to use all the wood and timber standing on the lands as should be necessary for mining purposes, and to erect such buildings and machinery upon the land, and to lay such railroad tracks and tram-ways, and make such other roads as might be necessary and convenient for mining purposes, and to use therefor any timber that might be standing upon the land. This grant of the right to use the timber was a concession by the lessors to the lessees, and does not in any manner affect the matter in dispute.

From the testimony in the case we have no doubt that the machinery and buildings were intended to be accessory to the mining under the provisions of the lease, and that there was no intention in affixing them to the realty to make them accessory to the soil; and it appears that they can be removed without material disturbance to the land. They were such structures as the defendant had a right to erect on complainant's land, and therefore the defendant occupies a position materially different from what it would be in if it had wrongfully annexed such machinery and buildings to the soil of another. Furthermore it very plainly appears that the property in dispute was not annexed to the land for the better enjoyment of the land itself, but for the exclusive purpose of carrying on the mining operations; and the manner of the annexation also tends to show that it was designed for a temporary purpose in connection with the lease under which defendants were operating.

Under the facts disclosed by the record in this case, we think the circuit court was right in entering a decree dissolving the injunction and dismissing the complainant's bill, and the decree is

Affirmed with costs.

The other Justices concurred.