## BROWN v. RENO ELECTRIC LIGHT & POWER CO.

(Circuit Court, D. Nevada. March 6, 1893.)

1. FIXTURES—LANDLORD AND TENANT—ELECTRIC LIGHTING PLANT.

Certain land, with water power, was leased for use in the operation of an electric lighting plant, and the lessee built on a solid stone foundation laid with mortar a substantial dynamo house, in which he placed two dynamos; also a boiler house of rough lumber upon sills laid on stone or blocks, and a shaft house or shed, constructed for the most part of old lumber from buildings on the premises. He also erected a shafting 29 feet long, resting upon trestles imbedded in the ground to the depth of two feet. *Held,* that the buildings as well as the machinery were accessory to the trade, and therefore trade fixtures subject to removal by the lessee on the termination of his lease.

2. SAME—SUBLETTING.

A covenant that the right of removal should not extend to the fixtures of sublessees, which was inserted at the lessee's request, with the intent and understanding that he might sublet to persons using the premises during the day for purposes other than those for which the lessee takes the land, did not affect the lessee's right to remove his own fixtures.

3. SAME—COVENANT TO REPAIR.

A covenant that the lessee should keep in good repair all buildings, erections, water wheels, flumes, dams, etc., and quit and surrender them at the expiration of his lease, except buildings erected by subtenants, should be construed to cover only buildings already on the land and those subsequently erected by the lessor, although the dam and other water-power appurtenances are to be built by the lessee for the lessor under a separate contract.

4. SAME—LESSEE'S OPTION TO PURCHASE.

A covenant that the lessee may within a certain time purchase the premises at a stated price does not affect his right to remove fixtures in case he does not purchase

5. SAME—PRIOR CONTRACT—WATER WHEEL AND SHAFTING.

A contract between the parties, made the day before the lease was executed, providing that the lessee shall build a dam, flume, penstock, etc., and put in a water wheel "in full working order," should not be construed so as to include a shafting not specifically contracted for, and which the lessee thereafter connects with the water wheel, when such a construction would take away his right to remove it on the termination of the lease.

6. SAME—RIGHT TO REMOVE AFTER LEASE EXPIRES.

A tenant who remains in possession as tenant at will after the expiration of his lease may remove fixtures as if his lease were still running.

At Law. Action by Samuel Brown against the Reno Electric Light & Power Company for breach of the covenants of a lease. Tried by the court without a jury. Judgment for plaintiff.

Robert M. Clarke and Charles A. Jones, for plaintiff.
Baker, Wines & Dorsey, for defendant.

HAWLEY, District Judge. This action was brought to recover $5,000 damages, alleged to have been sustained by plaintiff by the breach of certain covenants in a lease. On May 1, 1887, the plain-

tiff, being the owner of certain land bordering on the Truckee river, in Washoe county, contracted with one J. L. Stevenson to put a dam in the river, to construct a flume, ditch, and tail race, and to dig and construct at the end of said ditch a "penstock of the dimensions required for a 48-inch Leffel wheel," and to "put in place in full working order in said described penstock one Leffel water wheel, 48 inches in size, and sufficient to develop not less than 60 horse power." This work was, in due time, completed by Stevenson, and paid for by plaintiff. On May 2, 1887, plaintiff gave a lease to Stevenson of said land, including "the appurtenances which comprise the water power, ditch, flumes, dams, Leffel turbine wheel of 48 inches diameter, and tail-race ditch now about to be made and erected" by said Stevenson, for the term of five years, at a fixed monthly rental. It was, among other things, covenanted in said lease that if Stevenson at any time during the first three years of the lease should desire to purchase the leased premises for $13,000, the plaintiff would convey the same to him, "together with all the appurtenances, inclusive of water-power ditch, flumes, dams, wheel, tail-race ditch, and all buildings and erections of what kind or nature soever in and upon the said demised premises, *excepting such buildings as may be erected by tenants of the lessee during the currency of this lease.*" It was further covenanted that said Stevenson would "keep all buildings, erections, water wheels, flumes, dams, ditches, tail-race ditches, etc., upon the demised premises in good substantial repair during the whole term of this lease, and that at the expiration of said term * * * will quit and surrender the said premises and all appurtenances [repeating here the words in italics above quoted] in as goood state and condition as reasonable use and wear thereof will permit." When the lease was executed it was understood by the parties thereto that the leased premises were to be used in the nighttime for the purpose of producing or creating water power to be used in running and operating an electric light plant for the purpose of lighting lamps in the town of Reno. The clause in italics was not in the original draft of the lease, but was inserted at the request of Stevenson, so as to enable him to sublet the premises in the daytime for other purposes, and to enable such tenants to remove such buildings and erections as they might construct or put upon said premises for their own uses. The lease was assigned to defendant on the 20th day of October, 1888, and the leased premises were never used for any other purpose than that of operating an electric light plant. The defendant is entitled to the same rights and privileges, and is subject to the same conditions and liabilities, as the original lessee.

Prior to the assignment of the lease Stevenson erected upon the premises a substantial dynamo house, boarded up at the ends, and ceiled on the inside with dressed ceiling lumber. This building stood upon a solid stone wall foundation laid with mortar, and within the building were placed two dynamos. A boiler house was constructed of rough lumber, the sills being laid on stone and blocks, and an engine and boiler were placed therein. A shaft

house or shed was built mostly of old lumber taken from old buildings that were on the leased premises. Connecting the dynamos with the Leffel wheel was a line shaft 29 feet long and 4¾ inches in diameter, upon which wheels, pulleys, belts, etc., were placed so as to transmit the water power for the purpose of running the machinery and generating the electric light. This shaft rested upon five trestles, the bottom timbers of which were solidly imbedded in the earth about two feet deep. All of these buildings, with the machinery therein, were removed by the defendant. The work of tearing down the buildings and displacing the machinery commenced about the 25th of April, 1892, and continued daily until all the buildings were torn down and the machinery removed from its connections. The lease expired May 1st. There is considerable conflict in the evidence as to when the work of tearing down the buildings was completed. I think the evidence shows that the buildings were torn down, and the machinery loosened from its connections, and portions thereof removed from the premises, prior to the expiration of the lease. The main shaft and one of the driving wheels attached to it was not taken out until May 2d or 3d, and portions of the materials, lumber, etc., from the buildings, and portions of the machinery that had been taken out of the buildings, were not removed from the premises until the 4th or 5th of May.

The first, and most important, question is whether the defendant had the right to remove the buildings and machinery erected, constructed, and placed upon the leased premises by the lessee, as trade fixtures. There is more or less diversity of opinion in the various courts of the United States as to the rule which should be adopted in determining the question; as, for instance, whether the fixtures placed upon the premises by the tenant are so annexed to the soil as to become a part of the freehold, or whether the intention of the parties or the character of the fixtures should control independent of, or in connection with, the question of annexation to the soil. It is safe to say that no definite rule can be gleaned from the decisions of the supreme court of Nevada upon this subject. The cases, however, will here be noticed. In Prescott v. Wells, Fargo & Co., 3 Nev. 82, it is stated that the term "fixtures" is used in a variety of senses, and might mean "something substantially affixed to the land, but which may afterwards be lawfully removed therefrom by the party affixing it, * * * without the consent of the owner of the freehold." In Brown v. Lillie, 6 Nev. 244, the court declined to determine what might be considered trade, ornamental, or removable fixtures, but based its decision upon the ground that nothing could become a fixture in any sense of the word which was neither attached to the realty nor placed upon the land with a view to making it permanent, nor essential to the full and complete enjoyment of the land, and that actual annexation to the soil is an essential requisite to constitute a fixture belonging to the realty. In applying these principles it was held that a sawmill built upon timbers lying upon the surface of the ground, and constructed with the object and purpose, after sawing

the timber within a convenient distance, to be removed to another locality, is a mere personal chattel, and will not pass by a conveyance or patent of the land. In Treadway v. Sharon, 7 Nev. 37, the court declared the general rule to be that when a chattel, such as a steam boiler, engine, and machinery, had been affixed to the soil, it passed with the soil, and could not be removed; but it was admitted in the course of the opinion that as "between landlord and tenant this rule was relaxed to relieve the tenant from the dilemma of submitting either to the inconvenience of conducting his business with articles capable of use without annexation, or to the injustice of surrendering to his landlord, at the expiration of the term, articles unfit for use unless so fastened and steadied as to become fixtures." In Michigan it is held that there is no universal test whereby the character of what is claimed to be a fixture can be determined in the abstract; that neither the mode of annexation nor the manner of use is in all cases conclusive, and that it must usually depend on the express or implied understanding of the parties concerned. Wheeler v. Bedell, 40 Mich. 693; Iron Co. v. McCann, 86 Mich. 106, 48 N. W. Rep. 692.

Although every case must to a certain extent be governed by its own facts, and although no positive test can be applied that will be absolutely decisive of every given case, yet there are certain and well-defined principles which, if properly considered, will serve as a safe guide in arriving at a proper determination in all cases. In Wood's Landlord & Tenant (page 878, § 521) the following rule is stated as a result deducible from the authorities on this subject, viz.:

"In determining whether or not a chattel is so annexed to the freehold as to become a fixture, reference must be had to the nature of the chattel itself, the position of the party placing it where found, the probable intention in putting it there, the injury that would result from its removal, and the object of the party placing it on the premises with reference to trade, agriculture, or ornament."

Taylor, in his work on Landlord & Tenant, (8th Ed., pages 148, 149, § 544,) after stating the old rule as to fixtures at common law, to the effect that everything fixed to the land was considered as belonging to the proprietor, and adding that, as between landlord and tenant, the rigor of the old law had been gradually relaxed, said:

"Courts of law subsequently adopted the principle that it is for the benefit of the public to encourage tenants to make improvements in trade, and to do what is advantageous for the estate during the term, with the certainty of their being still benefited by it at the end of the term. And in modern times the rule is understood to be that, upon principles of general policy, a tenant, whether for life, for years, or at will, is permitted to carry away all such fixtures of a chattel nature as he has himself erected upon the demised premises for the purpose of ornament, domestic convenience, or to carry on trade, provided the removal can be effected without material injury to the freehold."

That the buildings and machinery removed by the defendant were what are known as "trade fixtures" seems to me very clear. They were part of the electric plant, separate from and independ-

ent of the penstock and Leffel wheel, which were placed upon the premises at the expense of the owner of the land. The dam, ditch, flume, penstock, Leffel wheel, and tail race were constructed and put in place under the contract for the purpose of creating a water power sufficient to run and operate an electric plant. Without that power it is fair to assume that neither Stevenson nor the defendant would have leased the premises. With it they were willing to rent the premises, and at their own expense they put in such machinery and erected such buildings as enabled them to run and operate the electric plant, and supply the town of Reno with electric lights. It is not reasonable to believe, in the absence of any express covenant to the contrary, that the lessee would have incurred the expense of erecting the buildings and procuring the necessary machinery to connect with the water power furnished by the lessor, unless he had the privilege of removing the same during the term or at the expiration of the lease. The right of removing trade fixtures should be liberally construed in favor of the tenant. There is no presumption that the tenant intended to make the buildings and machinery erected and put in place by him at his own expense a permanent accession to the freehold. On the other hand, if inferences and presumptions are to be indulged in, it is manifest that such was not the intention of the tenant. As was said by the supreme court of New York in Watts-Campbell Co. v. Yuengling, 3 N. Y. Supp. 869, affirmed in 125 N. Y. 1, 25 N. E. Rep. 1060, and quoted with approval in Havens v. Electric Light Co., (Sup.) 17 N. Y. Supp. 580, where it was held that machinery placed by an electric light company in a building erected by it on leased land does not become part of the realty:

"It is largely a question of intention whether machinery placed in a building is to be considered as attached to the freehold or not. There are numerous cases where the controversy has arisen between landlord and tenant, in which the principle has been laid down that fixtures erected by a tenant, in a building for the convenience of his trade may be removed by him at any time during his term; and this conclusion is arrived at upon the principle that they were necessary for the carrying out of his trade, and that, as he was not the owner of the fee, there was no presumption that he intended to make them part thereof. So it was held as early as the case of Holmes v. Tremper, 20 Johns. 29, that a cider mill and press erected by a tenant at his own expense, and for his own use, though fixed to the soil, are his own property, and removable by him at the end of the term."

In Vail v. Weaver, 132 Pa. St. 363, 19 Atl. Rep. 138, the court held that the engine, machinery, and appliances of an electric light plant do not pass with the real estate upon which it is operated to the purchaser at a sale under a mortgage judgment unless it was the intention to make the plant a part of the realty when it was erected.

The plaintiff admitted upon the oral argument that defendant had the right to remove the engine, boilers, and the dynamos, but denied the right to remove the buildings in which they were placed. The buildings were erected for the sole purpose of protecting the machinery. It would seem upon sound reason that if this portion of the machinery could be removed the right to remove the dynamo

house and the boiler house ought not to have been questioned unless there is some express covenant reaching them, for, as we have already ·stated, the right to claim the buildings as .a part of the freehold on the ground that they were firmly affixed to the soil is not the only question to be considered. Regard is always to be had to the object, effect, and intent as well as to the mode of annexation. Seeger v. Pettit, 77 Pa. St. 437. An examination of the authorities will show that, as regards trade fixtures, it is now the well-settled rule that the tenant may take away whatever he erects, at his own expense, for the purpose of carrying on his trade or business, whether it be machinery or buildings, even though affixed to the soil or freehold, provided it can be done without material injury to the land. In Conrad v. Mining Co., 54 Mich. 249, 20 N. W. Rep. 39, the court held that, as between landlord and tenant of a mining lease, engines and boilers erected by the tenant on brick and stone foundations, and bolted down solidly to the ground, and walled in with brick arches, and dwellings erected by the tenant for miners to live in, standing on posts or dry stone walls piled together, where such machinery and buildings were intended to be merely accessory to the mining operations under the lease, and when there was no intention in affixing them to the realty to make them accessory to the soil, and where they can be removed without material disturbance to the land, are regarded as trade fixtures, and may be removed at or before the termination of the lease. In Van Ness v. Pacard, 2 Pet. 137, decided in 1829, the supreme court held that a building erected by a tenant with a view to carry on his business as a dairyman, and for a residence for his family and servants engaged in that business, the residence of the family there being merely to enable them to carry on the trade more beneficially, may be removed by him during the term. Story, J., in delivering the opinion of the court, said:

"The question whether removable or not does not depend upon the form or size of the building, whether it has a brick foundation or not, or is one or two stories high, or has a brick or other chimney. The sole question is whether it is designed for purposes of trade or not. A tenant may erect a large as well as a small messuage, or a soap boilery of one or two stories high, and on whatever foundations he may choose. In Lawton v. Lawton, 3 Atk. 13, Lord Hardwicke said * * * that it made no difference whether the shed of the engine be made of brick or stone. In Penton v. Robart, 2 East, 88, the building had a brick foundation, let into the ground, with a chimney belonging to it, upon which there was a superstructure of wood. Yet the court thought the building removable. In Elwes v. Maw, 3 East, 38, Lord Ellenborough expressly stated that there was no difference between the building covering any fixed engine, utensils, and the latter. The only point is whether it is accessory to carrying on the trade or not. If bona fide intended for this purpose, it falls within the exception in favor of trade. The case of the Dutch barns before Lord Kenyon (Dean v. Allalley, 3 Esp. 11; Woodf. Landl. & T. 219) is to the same effect."

Further on in the same opinion it is said:

"If the house were built principally for a dwelling house for the family, independently of, carrying on the trade, then it would doubtless be deemed a fixture, falling under the general rule, and immovable. But if the residence of the family were merely an accessory for the more beneficial exercise

of the trade, and with a view to superior accommodation in this particular, then it is within the exception."

This case is cited with approval in Wiggins Ferry Co. v. Ohio & M. Ry. Co., 142 U. S. 396, 12 Sup. Ct. Rep. 188. There are no covenants in the lease which, in my opinion, change, or in any manner prevent, the application of the general principles of the law, as hereinbefore announced, to the facts of this case. The covenant giving the right to the lessee to sublet the premises to other parties for other uses did not affect, and evidently was not intended to affect, the legal rights of the lessee concerning the buildings, machinery, and appliances placed upon the premises by the lessee. The covenant in relation to repairs must be interpreted as having reference to the "buildings and erections" that were upon the premises when the lease was executed, or such other buildings or erections as might thereafter be placed thereon by the lessor. The covenant giving the privilege to the lessee to purchase the premises within a specified time certainly does not affect the question as to the right of the tenant to remove the buildings, machinery, and appliances which he put upon the property for the purpose of carrying on the business in which he was engaged. It is unreasonable to believe or presume that the plaintiff,—who is shown to have exercised great care in the preparation of the lease,—if it had been the understanding or intention of the parties at the time the lease was executed that all buildings, machinery, and appliances necessary to run and operate the electric plant should be left upon the premises and become the property of the lessor at the expiration of the lease, would have signed the lease without inserting a direct covenant to that effect.

Considerable stress was placed by the plaintiff's counsel in his oral argument upon the meaning of the words "full working order." These words, as used in the contract, referred to the construction of the penstock and the placing therein of the Leffel wheel. This wheel was minutely described, its exact size stated, and it was to be put in full working order, "sufficient to develop not less than sixty horse power." This power, as thus described, was to be, and was, developed by the plaintiff at his own expense, and the penstock and wheel were not removed, and have not been materially disturbed by the acts and conduct of defendant. The argument of plaintiff's counsel to the effect that the wheel could not be put in "full working order" without the appliances and machinery to connect it with the dynamos, and that such appliances must therefore be construed and treated as part of the wheel in full working order is certainly untenable, illogical, and unsound. If it was understood that these appliances were necessary to put the wheel in full working order, plaintiff should have sued Stevenson for a failure to comply with his contract. It is admitted that the contract was carried out, and that plaintiff paid the full price to be paid for the work, and there was no suggestion upon the completion of the contract that the Leffel wheel was not in full working order. The truth is, as we have before stated, that all the appliances, belts, wheels, etc., along the line shaft and connecting the Leffel wheel with the

dynamos were a part of the electric plant, put in at the expense of the lessee; were trade fixtures, which were removable by the lessee at the expiration of the lease. In Holbrook v. Chamberlin, 116 Mass. 155, the plaintiff leased to defendants for the term of five years "a certain factory building and water privilege, with all the appurtenances thereto belonging," and the defendants covenanted to quit and deliver up the premises and all future erections and additions thereto in as good order and condition as the same then were or might be put by them. The plaintiff agreed to sell to the defendants, at any time within two years, the property known as the "Sutton Woolen Manufacturing Establishment" for a specified sum. There was a second lease for a like term for all the land and buildings as they are upon the premises known as the "Sutton Mills Estate," with a like covenant upon the part of defendants to deliver the premises in good order and condition. The premises were used by defendants for about one year, and were then changed to a cotton mill, and afterwards used as such. The machinery used therein was operated by water power in the usual manner. The defendants placed in the mill additional machinery, consisting of countershafting, pulleys, hangers, and belts. The countershaft was belted from the main shaft, and, with the pulleys and hangers appertaining thereto, was fastened to the timbers or floors of the building by bolts and screws, and was connected to the machines by belts. This machinery was all purchased for and was adapted to the use of the mill as a cotton mill. The defendants also used appliances for heating the mill by steam by means of a portable boiler and steam piping passing through the floors of the factory, and supported by hooks screwed to the building, etc. Gray, C. J., in delivering the opinion of the court, said:

"It was admitted at the argument that at the beginning of the term there was no machinery on the premises except the main shaft. The countershafting, pulleys, hangers, and belts, the portable boiler and the steam pipes connected with it, were either trade fixtures, removable by the lessees during the term, or personal chattels. * * * The fact that the lease contained an agreement of the lessor to sell the premises to the lessees did not affect their right in this respect."

The buildings and machinery were not entirely removed from the premises before the expiration of the lease, and hence it is claimed that the removal was unlawful. In Wood's Landlord & Tenant, (page 908, § 532,) cited and relied upon by plaintiff, it is, among other things, said:

"It would rather seem that a tenant for years, who holds over on sufferance after the expiration of his term, may, during such holding over, remove such fixtures as he might have removed during the term; but if he quits possession pursuant to a notice and demand of possession, and leaves any fixtures on the premises, his right to them is gone."

As the testimony shows that defendant continued in possession of the premises until all the trade fixtures were removed, the text does not support the claim contended for by counsel. In Lewis v. Pier Co., 125 N. Y. 341, 26 N. E. Rep. 301, the court held that a tenant having the right to remove fixtures placed by him upon the demised premises during the term, in case he holds over after its termi-

nation without a new lease, has the same right of removal so long as he remains in possession, and, on being evicted by summary proceedings on account of such holding over, if he claims and is refused the right to take such fixtures with him, he may maintain an action for their conversion, and in the course of the opinion, upon this subject, it is said:

"There is no reason why the right should be lost before he quits possession as tenant, even though he holds over. The rule is based upon a question of public policy, which suggests that the tenant shall remove during his term—i. e. while in possession as a tenant—whatever he has the right to remove at all, so that the landlord may be himself protected, and so that the tenant shall not be permitted, after his surrender of possession, to enter upon the possession of the landlord or his succeeding tenant, and remove what he might have taken before, but which, by leaving, he has tacitly abandoned, and which the landlord may already have let to his succeeding tenant. A regard for such succeeding interests requires the adoption of a rule necessitating the removal of fixtures during the time of possession, but not in all cases during the running of the term."

Under this rule, and upon the undisputed facts of this case, the removal of the fixtures was not unlawful, and plaintiff is not entitled to any damages therefor. It is proper to add that there was no material damage to the freehold by the act of removal.

This case was tried before the court without a jury, and, having disposed of all the legal questions, it only remains for me to assess the damages to which plaintiff is entitled by reason of the failure of the defendant to keep the premises in good, substantial repair during the term of the lease, and to "quit and surrender the premises and all appurtenances in as good state and condition as reasonable use and wear thereof will permit." The testimony upon this point is conflicting, and wholly irreconcilable. It would serve no useful purpose to review it at any length. Suffice it to say that the testimony upon the part of plaintiff estimated the damages to be about $1,500, viz.: To repair the dam, about $715; flume, $555; ditch and tail race, $200; stone wall, $40. The testimony on the part of the defendant ranged from a mere nominal sum to about $200 for the entire work; the highest estimate to repair the dam being placed at about $100, and the highest estimate on the flume at $50. One witness, a carpenter by trade, testified that he would take a contract and give a bond to furnish all the lumber, materials, and labor and put the flume in good repair for $50. It was satisfactorily shown that with the dam, the ditch, and the tail race in perfect repair it was sometimes difficult to obtain the 60-horse water power necessary to run the electric plant, and that defendant had been compelled to repair the flume, and to frequently clean out the ditch, in order to get the required amount of water. It is shown that the plant was in full operation up to the time when the taking down of the buildings and removal of the fixtures was commenced, and that at that time there was as much water as usual running through the flume, etc. After due consideration of all the facts in this case, I assess the damages, under this covenant, in the sum of $125. Judgment will be entered in favor of plaintiff for that amount.