## MILBURN BY-PRODUCTS COAL COMPANY

### v.

### EAGLE LAND COMPANY

### (No. 10778)

Submitted April 25, 1956.      Decided June 19, 1956.

867

*Jackson, Kelly, Holt & O'Farrell, Homer A. Holt, Thomas B. Jackson,* for appellant.

*Spilman, Thomas, Battle & Klostermeyer, Robert S. Spilman, Robert S. Spilman, Jr.,* for appellee.

BROWNING, PRESIDENT:

This is a declaratory judgment proceeding brought by Milburn By-Products Coal Company, a corporation, plaintiff, hereinafter referred to in this opinion as Milburn, and Eagle Land Company, a corporation, defendant, subsequently referred to as Eagle, to determine the respective rights of the parties in and to the sum of $81,-287.05, which is deposited to the joint account of Milburn and Eagle in a Charleston bank. This sum of money was paid to the parties by the West Virginia Turnpike Commission for the purchase of 36.40 acres of land upon which was situate 17 houses and a large garage, evidenced by a deed dated October 31, 1953, jointly executed by Milburn and Eagle, the property being secured by the Turnpike Commission for right of way purposes; the conveyance by Milburn and Eagle to the Turnpike Commission of an additional tract of land upon which no buildings were located for use by the Commission in disposing of waste excavations in constructing the Turnpike, for which the Commission paid the sum of $ 2,562.50; and the sum of $865.60 which the Appalachian Electric Power Company paid for a right of way over the tract when the construction of the Turnpike

made it necessary for Appalachian to relocate its power lines in that area. The trial court found that the lessor, Eagle, is entitled to recover the sum of $5,458.95, that being the value of the 36.40 acre tract, exclusive of the buildings situate thereon, the entire sum of $2,562.50 for the additional tract secured by the Commission for the disposing of waste products, and the entire sum of $865.60 paid by the Power Company for its right of way in relocating its power lines. The court found that the lessee, Milburn, should recover the sum of $72,400.00, the value of the 17 dwelling houses, and the garage located on the 36.40 acre tract of land.

The appellant Eagle complains of the action of the trial court in awarding the sum of $72,400.00 to the appellee Milburn, and since there was no cross-assignment of error by Milburn, the sole question for determination upon this appeal is the correctness of the trial court's decree in awarding $72,400.00 to Milburn.

The Eagle Collieries Company, predecessor in title to Eagle, on October 1, 1912, leased to one McClanahan for a term of fifty years, a tract of land consisting of 2,600 acres lying in Raleigh and Fayette Counties, which lease gave the lessee the exclusive right and privilege to mine coal from all seams upon this tract with the rights "* * * generally for any purpose or purposes the Lessee may desire and which are properly incidental to the business of mining coal, manufacturing coke, and shipping the same * * *.", and the right and privilege to take from such tract the necessary timber for the operation of lessee thereunder, or for construction or improvements of any kind.

Inasmuch as Eagle relies strongly upon the provisions of Sections 6 and 10 of that lease, they are quoted in full: §6 - "The rent and royalty hereinbefore mentioned shall be treated and considered as rent reserved for the demised premises, and the Lessor shall have for the collection thereof all the rights and remedies which landlords now have or may hereafter have for the collection

of rent reserved upon contract under the laws of the State of West Virginia. And it is hereby expressly understood that the Lessor shall have for said rent or royalty a lien upon all the improvements and property of the Lessee upon the demised premises and also upon this lease and leasehold estate thereby created to secure all rent or royalty becoming due it hereunder, until the same is paid, and when any payment of rent or royalty or any part thereof shall have been due and unpaid for ninety (90) days or more after written demand upon the Lessee, his successors or assigns, all the property of the Lessee upon the demised premises and this lease and lease-hold estate hereby created or so much thereof as is necessary, may be distrained and sold to pay such rent or royalty, and in addition the Lessor shall have the right if it so desire to enforce by suit or action in any court of competent jurisdiction the lien hereby given it."; §10 - "At the termination of this lease, the Lessor may re-enter upon and take possession of the demised premises, and all the buildings, improvements, tracks, tipples, drum houses, and wires at that time attached to the freehold thereof and the same shall revert to and become the property of the Lessor. All cars, tools, store goods, wares, merchandise, boilers, engines, machinery and loose equipment, may, if the Lessee is not in default be removed from the demised premises within six (6) months after the termination of this lease or the extension thereof."

In 1913, the lease was assigned by McClanahan, with the consent of the lessor, to Milburn Coal Company, and in 1918, Milburn Coal Company assigned to the plaintiff Milburn, with the consent of the defendant Eagle, as successor to Eagle Collieries Company, the deed of assignment conveying "all of the mines, buildings, tipples, inclines, houses, tracks, rails, sidings, machinery, equipment, tools, supplies and improvements and structures of every kind whatever * * *." Milburn Coal Company, prior to its assignment to the plaintiff Milburn, built approximately 97 dwelling houses for its employees, this construction having taken place between 1913 and 1918, and

Milburn, in 1920, constructed 4 such houses and an additional 20 in 1942. The garage was constructed by Milburn in 1923. Four of the houses razed by the Turnpike Commission were constructed by Milburn in 1942, the other 13 having been constructed by Milburn Coal Company, the plaintiff Milburn's predecessor.

The evidence shows that O. R. Colan, Right Of Way Agent for the Turnpike Commission, believing Milburn to be the owner in fee of the tract in question, approached the general manager of Milburn relative to the purchase of the property for right of way purposes, and the general manager sent Colan to see Mr. Thomas, President of Eagle. On April 15, 1953, Mr. Thomas wrote the President of Milburn a letter informing him that: "We have asked for $150.00 per acre for the land alone, which amount has been accepted by the Commission and to which amount is to be added the value of the houses and other buildings, if any, upon the land in determining the total amount to be paid by the Commission. We suggest that you name a figure which you think represents the fair value of the houses and other buildings, and that such amount be added to the $150.00 per acre representing the value of the land, and that an offer then be made by Eagle and Milburn, as Lessor and Lessee, to the Road Commission [Turnpike Commission] to convey the entire right of way over the property, viz., land and houses, for the total sum determined upon the basis stated. * * *" It was suggested also in the letter that the total amount agreed upon should be deposited in a certain Charleston bank, and if the parties were unable to agree as to the division of the money, that question should be determined by arbitration. Milburn agreed to all of the terms except the bank in which the deposit was to be made, and as to arbitration. Milburn suggested that if the parties were unable to agree, the matter should be determined by a proper court proceeding and designated a different bank as a depository, to all of which Eagle agreed. Thereafter, Colan negotiated with the general manager of Milburn, and the sum of $72,400.00 was

agreed upon as the value of the 17 houses and the garage, which were located upon the tract.

On May 12, 1953, an agreement was entered into between Eagle, Milburn and the West Virginia Turnpike Commission, authorizing the latter to enter upon the land in question "and to remove immediately any improvements thereon and to do all things necessary or useful in the construction of a non-access turnpike." It was further provided that: "Eagle and Milburn have agreed to sell to The Commission their aforesaid interests for the sum of Seventy-seven Thousand, Eight Hundred Fifty-eight Dollars and Ninety-five cents ($77,858.95), which represents, for the purpose of this agreement, of the deed hereinafter mentioned and described, and of any condemnation proceeding for the acquisition of said Turnpike Right of Way, just compensation to Eagle and Milburn; * * *." One of the "WHEREAS" clauses of the agreement stated that:

> "Eagle and Milburn are presently negotiating an agreement between themselves providing for the determination of their respective rights, titles and interests in and to said sum of Seventy-seven Thousand, Eight Hundred Fifty-eight Dollars and Ninety-five Cents ($77,858-.95), but pending the consummation of said agreement, The Commission desires to obtain certain rights and privileges, upon the terms and conditions hereinafter mentioned and described."

Then comes the provision which Eagle contends is determinative of the rights of the parties to this proceeding:

> "NOW, THEREFORE, the parties hereto agree:
> 
> "1. Eagle and Milburn will sell and The Commission will buy all of the land shown in red on the aforesaid map and all improvements thereon for the sum of Seventy-seven Thousand, Eight Hundred Fifty-eight Dollars and Ninety-five Cents ($77,858.95), payable as herein provided. * * *"

On May 25, 1953, Milburn and Eagle entered into an

agreement which provided that: "Upon payment by the West Virginia Turnpike Commission of the sum of Seventy-seven Thousand, Eight Hundred Fifty-eight Dollars and Ninety-five Cents ($77,858.95), as hereinafter provided (which the parties agree represents a payment of Five Thousand, Four Hundred Fifty-eight Dollars and Ninety-five Cents ($5,458.95) for the land and Seventy-two Thousand, Four Hundred Dollars ($72,400.00) for the improvements), Eagle and Milburn shall join in a conveyance to said West Virginia Turnpike Commission of the lands and improvements thereon, * * *." After the provisions that "Payment for both land and improvements shall be made by check or draft payable jointly to Eagle and Milburn", and deposited in a Charleston bank to their joint account, and agreement between the parties as to the manner in which the division between them was to be determined, is this concluding paragraph: "It is expressly understood and agreed that the parties hereto, by the execution of this agreement and of the deed referred to herein conveying said land, leasehold and improvements to the West Virginia Turnpike Commission, do not, as between themselves, waive, prejudice or relinquish any of their respective rights or claims in or to the portion of the land, the leasehold estate, the improvements, or any interest therein so sold; and that the rights and interests of the parties in or to the fund deposited in Kanawha Banking and Trust Company shall be measured and apportioned in accordance with their respective interests in said property as measured and 'determined under the provisions of the aforesaid lease from Eagle Collieries Company to P. M. McClanahan, dated October 1, 1912, as transferred and amended, with like effect as if the interests of both parties in the leased land and improvements had been condemned for public use by said Turnpike Commission."

By deed dated October 31, 1953, Milburn and Eagle conveyed to the West Virginia Turnpike Commission the property in question, the deed containing these pertinent provisions:

"WHEREAS, the parties of the first part and each of them desire by this deed to convey to party of the second part their respective interests in the several parcels hereinafter mentioned and described, subject, however, to the terms and conditions hereof;

"NOW, THEREFORE,

"In sole consideration of the sum of Seventy-seven Thousand Eight Hundred Fifty-eight Dollars and Ninety-five Cents ($77,858.95), the receipt and sufficiency of which are hereby acknowledged, and the provisions of this deed, the parties of the first part do hereby grant, sell and convey unto the party of the second part their respective interests, together constituting the fee simple estate, * * * in and to these certain parcels of land which are situate in Kanawha District, Fayette County, West Virginia, * * *."

Reference should be made to one other instrument in this record. The original lease of 1912 was for a period of fifty years with provisions that the lessee might renew it until all of the workable seams of coal had been exhausted. By deed dated August 1, 1952, between Milburn and Eagle, the provisions of the original lease with reference to termination are modified to the extent that the lease would terminate on September 30, 1962, unless the lessee gave at least six months notice prior thereto of its desire to extend the lease, and if such notice was given the lease would continue until all coal was exhausted from the seams upon the tract. The testimony shows that the coal from all of the seams of the tract could not be removed until about the year 1974.

There is little conflict in the testimony presented to the trial court upon the questions material to a determination of this litigation. D. Holmes Morton testified as a witness for Milburn, and stated that he was the general manager for Milburn Coal Company from 1913 until 1916, and that it was under his direction that the 97 miner's houses were constructed, as well as other build-

ings necessary to constitute a mining plant. He stated that at that time the area in question was undeveloped, there were no roads or vehicular transportation by which employees could live elsewhere and work at the mine, and that it was for that reason that the first 97 houses were erected. He further stated that the coal mine could not have been operated without them. The witness described the manner of construction of the houses, and stated that, with the exception of 2 or 3 that were built for officials of the company, they were built as cheaply as possible to make them comfortable; that they were set on concrete piers which extended down to the frost line, with no connection between the houses and the piers except that which gravity provided; that the houses had neither bathrooms nor cellars; and that they could be "moved without any damage to the land." The evidence showed that it became necessary to construct the 20 additional houses by Milburn in 1942 because of the lack of transportation caused by the rationing of gasoline during the period of the Second World War, and that they were of similar construction to the houses formerly erected. Milburn further showed by this witness and Gallager, its general manager, that the lessees built as many or as few houses as they chose, paid the fire insurance premiums thereon, and, when a house was destroyed, received and kept the sum paid by the insurance company for such loss; and that on one occasion, a house was sold and removed from the tract, and, on another occasion, several houses were destroyed by a flood without being replaced, to all of which Eagle made no objection. There was also testimony from the plaintiff's witnesses to the effect that many of the houses on the tract in 1953 were uninhabited, and that they would not be rehabilitated, inasmuch as improved transportation in the area had reduced the necessity for maintaining a large number of these houses.

Mr. Colan, the agent for the Turnpike Commission, testified that: "We negotiated with the parties, with Milburn for the houses and Eagle for the land, at the suggestion of the parties involved." There was evidence of-

fered on behalf of Eagle that these houses if removed from the land would have little value, but the court sustained objection to it upon the ground that it was immaterial, inasmuch as by the agreement to purchase and the deed between the parties to this proceeding and the Turnpike Commission, the value of the land taken and of the buildings thereon had been fixed.

The general rule that whatever is affixed and annexed to the soil becomes a part of it, and cannot be removed except by the person who owns the freehold estate therein, is too well established for the citation of authority or other comment. However, an examination of the authorities in this country, as well as in England, shows that there is a well established exception to that rule. The leading case in this country upon this question is *Van Ness* v. *Pacard*, 2 Pet. 137, decided by the Supreme Court of the United States in 1829. In the opinion, the general rule was stated, and then the court said: "* * * But an exception of a much broader cast, and whose origin may be traced almost as high as the rule itself, is of fixtures erected for the purposes of trade. Upon principles of public policy, and to encourage trade and manufactures, fixtures which were erected to carry on such business, were allowed to be removed by the tenant during his term, and were deemed personalty for many other purposes." The court, after stating that while the exception had never been applied to a large house that had been built and used in part as a family residence, said: "But the question, whether removable or not, does not depend upon the form or size of the building, whether it has a brick foundation or not or is one or two stories high, or has a brick or other chimney. The sole question is whether it is designed for purposes of trade or not. * * *"

While the decisions of the state courts of this country are not entirely harmonious upon the question, the overwhelming weight of authority supports the rule laid down in *Van Ness* v. *Pacard, supra.* Without attempting to review all of the cases upon this question, reference is made

to the annotations to the case of *Cameron* v. *Oakland County Gas and Oil Co., et al.,* 277 Mich. 442, 269 N. W. 227, as reported in 107 A.L.R. 1142. It will be noted that, in several of the cases contained in that annotation, houses erected by lessees for the purpose of renting to employees were held to be removable trade fixtures. *Conrad* v. *Saginaw Min. Co.,* 54 Mich. 249, 20 N. W. 39; *Couch* v. *Welsh,* 24 Utah 36, 66 P. 600. See also *Middleton* v. *Alabama Power Co.,* 196 Ala. 1, 71 So. 461; and *MacArthur Bros. Co.* v. *Middleton,* 200 Ala. 147, 75 So. 895.

While this Court has not passed upon the question as regards the construction of buildings by a lessee, the following cases are pertinent: *Kanawha National Bank* v. *Blue Ridge Coal Corp.,* 107 W. Va. 397, 148 S. E. 383; *Freeman* v. *Truax,* 103 W. Va. 132, 136 S. E. 697; *Snuffer* v. *Spangler,* 79 W. Va. 628, 92 S. E. 106; *Gartlan* v. *Hickman,* 56 W. Va. 75, 49 S. E. 14; *Childs* v. *Hurd,* 32 W. Va. 66, 9 S. E. 362. These decisions of this Court emphasize the intention of the lessee in attaching property to the real estate of the lessor, that is as to whether it was for the purpose of increasing the value of the land, or whether the attachment was for the sole benefit of the lessee in conducting his trade or business. In each case then it becomes a question of fact whether fixtures placed upon the land of a lessor by a lessee are permanent or removable. Upon the evidence presented, as well as the answer of Eagle, we find that the trial court correctly held that the 17 houses and the garage erected by the lessee were removable trade fixtures.

Eagle, while denying that these houses were trade fixtures, relies, in brief and argument, primarily upon other points that must be considered. It says that assuming that these structures were, prior to the negotiations of 1953, trade fixtures, the agreement of May 12, 1953, and the language of the deed of October 31, 1953, are conclusive upon Milburn in that in the former it was agreed that the land and the improvements thereon would be conveyed to the Turnpike Commission, and that

in the deed the land and the improvements were conveyed without reference to personal property, which the houses were if they were trade fixtures.

This Court finds that the trial court properly held that the letter of April 15, 1953, the agreement of May 12, 1953, the agreement of May 25, 1953, and the deed of October 31, 1953, must be read together in determining the intention of the parties with regard to this transaction. It will be noted from quotations heretofore made from these instruments that the May 12 agreement refers both to the deed that was later executed, and the contemplated May 25 agreement between Milburn and Eagle. When they are read together, we find that the word "land" in the May 12 agreement, and the use of that word in the deed of October 31, 1953, is not conclusive, and was not intended to be in view of the clear language of the agreement between Milburn and Eagle of May 25 that the parties thereto "do not, as between themselves, waive, prejudice or relinquish any of their respective rights or claims in or to the portion of the land, the leasehold estate, the improvements, or any interest therein sold; * * *." Furthermore, the provision in that agreement that the rights and interests of the parties should be "measured and apportioned in accordance with their respective interests in said property * * * with like effect as if the interests of both parties in the leased land and improvements had been condemned for public use by said Turnpike Commission.", under the provisions of the lease of October 1, 1912, as transferred and amended, must be given effect. It is not material as between the parties to this proceeding that the deed of conveyance required by the Turnpike Commission used the usual language found in conveyances of fee-simple estates.

In Nichols on Eminent Domain, Sec. 5.81 [2], it is stated that: "It frequently happens that, in the case of a lease for a long term of years, the tenant erects buildings upon the leased land or puts fixtures into the building for his own use. It is well settled that, even if the

buildings or fixtures are attached to the real estate and would pass with a conveyance of the land, as between landlord and tenant they remain personal property, and, in the absence of a special agreement to the contrary, may be removed by the tenant at any time during the continuation of the lease provided such removal may be made without injury to the freehold. This rule is, however, entirely for the protection of the tenant and cannot be invoked by the condemning party. If the buildings or fixtures are attached to the real estate, they must be treated as real estate in determining the total award, but in apportioning the award they are treated as personal property and credited to the tenant."

It is also contended by Eagle that by the agreement of May 12, 1953, there was a pro tanto termination of the lease as to the 36.40 acres, resulting in the reversion of the buildings thereon to the lessor under the provisions of Article 10 of the 1912 lease. Upon this question, the provisions of Code, 37-6-29, are applicable: "Whenever the whole of any tract of land which is under lease is taken under the power of eminent domain, the liability of any tenant of such land to pay rent thereon shall terminate unless the lease expressly provide otherwise. If any part of a tract of land which is under lease, or any easement or other interest in such land, is taken under the power of eminent domain, the rent of any tenant of the land shall, unless the lease expressly provide otherwise, be reduced in the proportion which the value of the land or interest taken bears, at the time of such taking, to the total value of the land upon which rent was payable, under the lease. The foregoing provisions shall not affect nor impair any right which a tenant of land may have to compensation from the person exercising the right of eminent domain, for the value of his lease, or other property upon the leased premises belonging to him, or in which he may have an interest, if such value shall exceed the amount of the rent from the payment of which he is relieved by virtue of the provisions of this section."

While there was no actual condemnation proceeding by which this land was taken, the agreement of May 12, 1953, the agreement between Milburn and Eagle of May 25, 1953, and the conveyance of October 31, 1953, conclusively show that the property was conveyed to the Turnpike Commission by Milburn and Eagle in lieu of a proceeding in eminent domain. Therefore, for the purpose of a division of the funds thereby received and the reduction in rent as to that part of the leased premises taken, the provisions of Code, 37-6-29, are applicable. Neither party has raised an objection to the decree of the trial court in which it found that Milburn was entitled to an abatement of its rent for the remainder of the term of the lease, in the proportion which the 36.40 acres bears to the total acreage under lease as provided by Code, 37-6-29.

It is true that Eagle has lost its lien upon the buildings which were situate on the 36.40 acre tract of land conveyed to the Turnpike Commission since those buildings were razed in the construction of the Turnpike, although Article 6 of the lease of 1912 gave Eagle such a lien upon all installations and buildings to be thereafter placed upon the 2,600 acre tract. However, there is no evidence that there was in 1953, or had theretofore been, any default in the payment of rent and royalties by Milburn, and since Eagle joined in the agreement to sell and the deed of conveyance, it waived any rights that it might have had under the provisions of Article 6. The same principle applies as to the reverter clause of Article 10 of the lease. Furthermore, Article 10 provided for the reversion only of such property as remained attached to the freehold at the time of the expiration of the lease.

This Court finding no error in the decree of the Circuit Court of Kanawha County of June 4, 1955, it is affirmed.

*Affirmed.*