MERCANTILE TRUST & DEPOSIT CO. OF BALTIMORE v. ROANOKE & S. RY. CO. et al.

(Circuit Court, W. D. Virginia.  February 12, 1901.)

1. JURISDICTION OF FEDERAL COURTS—INJUNCTION STAYING PROCEEDINGS IN STATE COURT.

The power of a federal court to grant an injunction restraining the prosecution of an action in a state court on the ground that the federal court previously acquired, and still has, jurisdiction over the subject-matter of such action in a pending cause, is not affected by Rev. St. § 720, providing that no injunction shall be granted to stay proceedings in a state court, which has no application where the injunction is sought to protect the court's own prior jurisdiction.[1]

2. SAME—PRIORITY OF JURISDICTION.

A railroad company and a mining company entered into a contract by which the latter agreed to construct the roadbed for a spur track to its mines from the line of the railroad, and to convey title to the same to the railroad company, which was to iron and operate the spur, and repay to the mining company the cost of the roadbed from freights received. After the spur was constructed and in operation, suit was brought in a federal court to foreclose a mortgage on the road, which was sold therein to a new company. The mining company filed a petition of intervention in such suit, asserting its right to payment of the remainder due on its roadbed, which was resisted on the ground that it had not conveyed title to the railroad company as required by the contract. Suit having been brought in a state court to foreclose liens on the property of the mining company, in which a receiver was appointed, so that the company could not make title to the right of way of the spur track as required by the contract, and the mines being no longer operated, the new railroad company removed the track therefrom. The receiver of the mining company then brought an action of trespass in the state court to recover damages for such removal, the petition of intervention in the federal court being still pending and undetermined. *Held*, that the subject-matter of the action at law and the intervention was the same, namely, the rights of the mining company under the contract, and, in so far as the action in the state court sought recovery for property which passed to the railroad company by the sale, the parties were also the same, the decree under which the sale of the railroad property was made having required the purchaser to pay the amount of any claims which the court should thereafter determine to be prior in lien or superior in equity to the mortgage, and that the federal court, having first acquired jurisdiction, would protect such jurisdiction by injunction restraining the further prosecution of the action in the state court as to such property.

3. RAILROADS—PROPERTY PASSING UNDER MORTGAGE—TRACK LAID ON LAND OF ANOTHER.

Where a railroad company furnished the ties and rails and laid a spur track upon a roadbed owned by another, under an agreement between them, such track did not become a part of the realty, as between

---

[1] Restraining proceedings in state courts, see notes to Garner v. Bank, 16 C. C. A. 90; Trust Co. v. Grantham, 27 C. C. A. 575.

the parties, but remained the property of the company, and passed by a sale under a mortgage previously given by it, covering after-acquired property.

In Equity. Suit for foreclosure of a railroad mortgage. On petition of the Norfolk & Western Railway Company for an injunction in the action of Thomas Lewis, receiver of the Castle Rock Mining Company, and others, against the Norfolk & Western Railway Company.

Geo. E. Sipe, Jos. I. Doran, and Watts, Robertson & Robertson, for petitioner.

S. Hamilton Graves, Thos. W. Miller, and John M. Hart, for Castle Rock Min. Co. and Thos. Lewis, receiver.

PAUL, District Judge. This is an application of the Norfolk & Western Railway Company, hereinafter called the "Railway Company," by petition for injunction, to restrain the further prosecution of an action at law instituted in the circuit court of Roanoke county, Va., wherein Thomas Lewis, receiver of the Castle Rock Mining Company, hereinafter called the "Mining Company," a corporation organized under the laws of Virginia, is plaintiff, and the railway company is defendant. The petitioner grounds its prayer for this relief on the contention that the cause of action asserted in the state court is the claim of the mining company that its alleged rights under a certain contract have been violated in the removal from its premises by the railway company of certain chattels embraced in the property, franchises, and assets administered in this cause, and acquired by the petitioner under conveyance directed by this court, with the consequent protection against adverse claims provided in the deed of conveyance and the decree directing the same, wherein jurisdiction was retained by this court for the determination of such adverse claims, and upon the further ground that the plaintiff in the action at law has, by his petition in this cause, concurrently pending in the circuit court of the United States for the Eastern district of Virginia, acknowledged and invoked the jurisdiction of the federal court in this cause to determine the rights of the railway company as to the property in controversy, and therefore that such jurisdiction of this court cannot be ousted, but should be protected and enforced by the usual injunctive process. To this petition Thomas Lewis, receiver of the mining company, has filed a demurrer; and the mining company and Thomas Lewis, receiver, have also filed their answer. Depositions have been taken, and numerous exhibits filed.

It appears that the mining company, in order to obtain better facilities for the shipment of ore from its premises, entered into a contract in writing on the 25th of April, 1893, with the Roanoke & Southern Railway Company and the Norfolk & Western Railroad Company for the construction of a branch railroad from a point on the main line of the Roanoke & Southern, the property and franchises of which were then leased to the Norfolk & Western Railroad Company, to the mines of the mining company, a distance of about three miles. This contract provided, inter alia, that the mining company should forthwith convey to the Roanoke & Southern Railway Company an

unincumbered title to the right of way, and thereafter, with diligence, construct thereon the roadbed, including the grading, trestles, bridges, and culverts, preparatory for the superstructure. The latter, including rails, ties, switches, frogs, etc., was to be furnished and erected by the Roanoke & Southern Railway Company, called the "lessor company," with funds furnished by the Norfolk & Western Railroad Company, called the "lessee company." The branch, when completed, was to be operated by the lessee company, by whom the cost of constructing the roadbed was to be refunded to the mining company, by the allowance to the latter of a rebate of 10 cents per ton on the freight originating on the branch line, and carried to or beyond the lines of the lessee company; and if the mining company, for a period of six months, continuously abandoned operations along the said branch, or failed to furnish business sufficient to defray the expenses of maintaining and operating the same, then the lessee company might, after 90 days' notice, and further default of the mining company, discontinue the operation of the branch, and remove the superstructure therefrom. The branch line was built and operated from September, 1893, to May, 1896, after which latter date no ore was mined or shipped. The conveyance of right of way required by the contract was never made. The property and franchises of the lessor company and of the lessee company having passed into the hands of receivers in these foreclosure proceedings,—the former in February, 1895, and the latter in May, 1896,—the receivers of the lessee company continued in possession of the Castle Rock branch and operated the same till the cessation of shipments by the mining company. In November, 1896, the Norfolk & Western Railway Company acquired the property and franchises of the lessor company, which had been sold and conveyed under decrees in this cause; the same purchaser having previously acquired, through similar sale and foreclosure, the property of the lessee company. These proceedings for foreclosure were prosecuted contemporaneously in the Eastern and Western judicial districts of Virginia, apparently because of the situs of the mortgaged premises in both districts. In the cause thus concurrently pending in the circuit court of the United States for the Eastern district of Virginia, the mining company, on May 21, 1896, filed its petition of intervention, praying to be made a party complainant therein, and named as defendants the Mercantile Trust & Safe-Deposit Company, trustee in one of the mortgages, the Norfolk & Western Railroad Company, and the Roanoke & Southern Railway Company, defendants. The contract of April 25, 1893, was set forth and relied on in support of certain demands, including the claim for balance due on account of cost of grading, etc., the roadbed of the Castle Rock branch. After process regularly awarded, the answer of F. J. Kimball and Henry Fink, receivers of the lessor and lessee companies, was filed on August 29, 1896. In June, 1896, and for a considerable period thereafter, negotiations between the mining company and a committee representing the Norfolk & Western Railway Company, then in process of organization, for the purchase of the foreclosed properties, were on foot, with a view to the further operation of the Castle Rock branch. And a proposition of the com-

mittee providing for a recognition of the contract of April, 1893, payment of the balance due the mining company on construction account, upon a modified basis of rebate, or percentage per ton of freight, and an immediate conveyance of an unincumbered right of way, appears to have been acceptable to the mining company. But the last stipulation as to right of way prevented this plan of settlement. It developed that the right to the right of way was incumbered by sundry liens, which, together with others afterwards accruing, rendered impossible a compliance with the covenants for clear title on the part of the mining company, against which latter company proceedings were instituted in chancery in the state court, and a decree entered for the sale of its property to satisfy certain of these liens. The negotiations thus rendered abortive were ultimately declared off; and the railway company, with the alleged intention of avoiding the complication of its property with the possible demands of a purchaser at a judicial sale of the Castle Rock lands, in January, 1897, began the removal of the rails, ties, and other parts of the track superstructure from the Castle Rock branch, possession of which it then held, and had continued to hold after acceptance of the Roanoke & Southern property from the receivers of this court. Thomas Lewis was afterwards appointed receiver of the mining company, and subsequently instituted the action at law complained of. This outline of the facts brings us to the consideration of the questions now submitted to the court.

Sundry objections are raised by the demurrer, the first of which relates to the inhibition of section 720, Rev. St. U. S., against the granting of injunctions by federal courts to restrain proceedings in a state court. Repeated decisions have firmly established the principle that, where the injunctive process of a federal court is invoked to enforce its own judgment or protect its own jurisdiction, section 720 has no application. French v. Hay, 22 Wall. 250, 22 L. Ed. 857, and Dietzsch v. Huidekoper, 103 U. S. 494, 26 L. Ed. 497. In Fisk v. Railroad Co., 10 Blatchf. 520, Fed. Cas. No. 4,830, Judge Blatchford said:

"The provision of section 5 of the act of March 2, 1793, that a writ of injunction shall not be granted to stay proceedings in any court of a state, has never been held to have, and cannot properly be construed to have, any application, except to proceedings commenced in a state court before the proceedings are commenced in the federal court; otherwise, after suit brought in a federal court, a party defendant could, by resorting to a suit in a state court, defeat in many ways the effective jurisdiction and action of the federal court after it had obtained full jurisdiction of person and subject-matter. Moreover the provision of the act of 1793 (now section 720. Rev. St.) must be construed in connection with the provision of section 14 of the act of September 24, 1789, that the federal courts shall have power to issue all writs which may be necessary for the exercise of their respective jurisdictions. 1 Stat. 81, 82."

Upon a former consideration of this question this court said (Fidelity Ins., Trust & Safe-Deposit Co. v. Norfolk & W. Ry. Co. [C. C.] 88 Fed. 820):

"In enforcing the provisions of this decree, and protecting its own jurisdiction, the court does not, as contended in the second substantial ground of demurrer, violate the provision of section 720 of the Revised Statutes of the United States, which inhibits the granting of an injunction to prevent

Lilly from proceeding in a state court. The court, in granting an injunction to prevent Lilly from proceeding in the state court to establish a claim of which this court has jurisdiction, and so had when the suit in the state court was commenced, is in no wise invading the already-acquired jurisdiction of the state court. This court is only endeavoring to protect its own jurisdiction and to enforce its own decrees. Without this, its efficiency would not only be seriously impaired, but its authority in many cases rendered nugatory." Fidelity Ins., Trust & Safe-Deposit Co. v. Norfolk & W. Ry. Co. (C. C.) 88 Fed. 815, where further authorities are cited in support of this proposition.

But this petition for injunction predicates its prayer for relief on the distinct ground that the federal court has acquired, and now has, jurisdiction of the subject-matter in this controversy in a pending cause. If this contention is maintained, it is clear that section 720 is not relevant. The second ground of demurrer raises the same objection, but with specific reference to the position of Thomas Lewis as receiver under appointment of a state court. It was settled in the early history of the federal judiciary that the effect as well as the efficiency of its processes was not controlled or affected by the official or fiduciary relations of those upon whom they are served. There seems to be no ground for the distinction claimed. The third objection, that both plaintiff and defendant are residents of the state of Virginia, is equally untenable. Diverse citizenship is not alleged or relied on as a ground for jurisdiction in the plaintiff's petition, which does not seek to call forth a new jurisdiction, but only the exercise of one already in existence. Besides, such applications by interveners who were interested in the res embraced in foreclosure proceedings are so uniformly entertained as to render unnecessary the discussion of this objection. The fourth objection is addressed to the essential equity of the petition, and will therefore be considered in that connection.

The first ground of intervention now to be considered upon the merits of this application is the pendency of the petition of the mining company, filed May 21, 1896, and the effect of the issues thereupon made by the answers of Receivers Kimball and Fink. The answer of the mining company and Thomas Lewis, receiver, to the present application of the railway company, contains an averment that, if its petition in the federal court had not been actually and formally dismissed, an agreement to that end had been reached between the mining company and the reorganization committee, and that therefore equity "will consider that which ought to have been done as done." The facts, however, do not justify the application of this equitable maxim. On the contrary, it appears from the evidence that the petition of the mining company in the federal court has not only never been dismissed, but that the conditions intended to be precedent to such dismissal have never been accomplished. This objection, therefore, cannot be maintained.

But the mining company next insists that, though the proceedings upon its petition are now pending, yet the issues raised thereupon and those arising in the action in the state court are so diverse, both as to the cause of action and the parties, as to produce no conflict of jurisdiction. In considering this proposition, it becomes neces-

sary to examine the grounds of dispute, and the attitude of the parties in these pending causes in the state and federal courts, respectively. The action in the state court demands damages for the removal of the superstructure from the Castle Rock branch. It brings in question the right of the petitioner to remove from the premises its own property in its own possession, reference being now had to only such property as is hereinafter held to have been acquired by the petitioner in the federal foreclosure proceedings. The technical character of the complaint is trespass; but the form of the action is of secondary significance, because the same facts will often support an action either in tort or in contract, in equity or at law. The ground or cause of action is of first importance, and this has been defined to be "the ground on which an action can be maintained." Black, Law Dict. p. 182. "It is composed of the right of the plaintiff, and the obligation, debt, or wrong of the defendant. This combination, it is sufficiently accurate to say, constitutes the cause of action." Veeder v. Baker, 83 N. Y. 160. What right of the mining company, therefore, was violated by this removal of property by its legal owner, and what is the evidence or muniment of the same? The answer can only be, the contract of April, 1893. This conclusion is inevitable from the pleadings, the evidence, and the argument on this application. Indeed, the answer of the mining company contains an averment referring in express terms the rights of the parties to the provisions of this contract. Its obligations are relied on in the argument of counsel for the mining company, and, if this alleged right has any other foundation or existence, it has not been suggested. The parties in the state court are the mining company, represented by its receiver, and the Norfolk & Western Railway Company. The same are parties in the federal court. In Rice v. Water Co. (C. C.) 91 Fed. 433, the court said, "After intervention the new parties are treated, to all intents and purposes, as if they had been original parties to the suit." The railway company by virtue of its purchase became a party and entitled to be heard on all questions affecting its interests, which in fact were more vitally involved in the mining company's intervention than those of any other party. Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379. The petition of the mining company sets out the contract of April, 1893, and seeks the enforcement of what it claims to be its rights thereunder. The answer admits the original execution of the contract, but denies that the mining company is entitled to any relief thereunder, because by its own defaults its right to the enforcement of the contract has been lost and defeated. It seems to be admitted in the argument that the contract must be treated as "entire," and therefore its essential existence and validity is thus at stake upon the issue joined in the federal court. If the latter may hold that it is not enforceable in behalf of the mining company, can it be said that there is no conflict of jurisdiction when the mining company goes into another forum and seeks to enforce alleged claims admittedly arising under the same contract? From such a dual administration upon one cause of action between the same parties embarrassments must needs result, to be deplored

and avoided by courts as well as litigants.  Upon a careful exam-
ination of the authorities relied on by counsel for the mining com-
pany, this court is unable to find in them jurisdictional support for
the action at law in the state court.  Barrows v. Kindred, 4 Wall.
399, 18 L. Ed. 383, construed an Illinois ejectment statute, and simply
held that a judgment against a plaintiff in ejectment could not be
pleaded in bar as res judicata in a subsequent action of ejectment
between the same parties, where the plaintiff relied on a new title
to the locus in quo, acquired after the first judgment.  The bearing
of this ruling upon the present inquiry is not apparent.  In Watson
v. Jones, 13 Wall. 679, 20 L. Ed. 666, the federal jurisdiction was
maintained against the plea of another suit previously pending in
a state court on grounds set out in the opinion as follows:  "The
pleadings in the present suit show conclusively a different state of
facts, different issues, and a different relief sought."  A decision
based upon such premises would not, as a precedent, seem applicable
to the dissimilar facts presented in this record.  Another case relied
on in the argument appears at first notice to be more rigidly re-
strictive in the application of the authority of the federal courts
in the protection of their jurisdiction than the rulings generally of
the supreme court of the United States; but, when carefully exam-
ined, it will be found to present no substantial conflict with the
best-considered cases, including those cited in support of the peti-
tion now before us.  This case (Buck v. Colbath, 3 Wall. 334, 18 L.
Ed. 257) raised the question as to the extent to which the federal
courts will protect their officers in the execution of their processes.
Among the cases held by the court as not within the reasoning of
this decision, it enumerated the following:

"Those in which the process or order of the court described the property
to be seized, and which contained a direct command to the officer to take
possession of that particular property.  Of this class are the writ of re-
plevin at common law, orders of sequestration in chancery, and nearly all
the processes of the admiralty courts by which the res is brought before
it for its action."

Thus, the case of Buck v. Colbath, by its own terms, is not au-
thority in cases of chancery sequestration of the character of this
foreclosure.  In this class of cases the doctrine of Freeman v. Howe,
24 How. 450, 16 L. Ed. 749, is uniformly maintained.  It was there
said by the court:

"It is a doctrine of law too long established to require citation of authori-
ties that, where the court has jurisdiction, it has a right to decide every
question which occurs in the case; and, whether its decision be correct
or otherwise, its judgment, until reversed, is regarded as binding in every
court, and that, where the jurisdiction of the court and the right of a
plaintiff to prosecute his suit in it have once attached, that right cannot
be wrested and taken away by proceedings in any other court."

In a later case of City of New Orleans v. Steamship Co., 20 Wall.
387, 22 L. Ed. 354, Mr. Justice Swayne has given even broader ex-
pression to this rule of jurisdiction in extending it to collateral or
auxiliary relief.  The following appears in his opinion:

"The circuit court, having first acquired possession of the original case,
was entitled to hold it exclusively until the case was finally disposed of,

and any relief to which the city was entitled should have been sought there, and that court was competent to give it either in the original or in an auxiliary cause. As to any other court the matter was ultra vires."

The rights of both parties, as above shown, in so far as their dispute affects the property now considered, are created and determined, both in the state and federal courts, by the contract of April, 1893; and, in the view of this court, the adjudication of that agreement in the federal court must decide whether it can be enforced at all, and therefore must include both parties in both jurisdictions. The record presents, therefore, a case of jurisdictional interference, for the correction of which the injunctive process is available by the federal court whose powers were first invoked.

The second ground upon which the interposition of this court is now prayed for is based upon the terms of the decree of sale, and substantially repeated in the deed to the railway company. This provision is as follows:

"The purchaser shall, as part consideration for the railroad, property, and franchises purchased, take the same and receive the deed therefor upon the express condition that, to the extent that the assets or the proceeds of assets in the receivers' hands not subject to any other lien or charge shall be insufficient, such purchaser, his successors or assigns, shall pay, satisfy, and discharge (a) any unpaid compensation which shall be allowed by the court to the receivers; (b) any indebtedness and obligations or liabilities which shall have been contracted or incurred by the receivers before delivery of possession of the property sold, in the management, operation, use, or preservation thereof; and (c) also all unpaid indebtedness or liability contracted or incurred by the defendants, or either of them, in the operation of said railroad and property sold, which is prior in lien or superior in equity to said mortgage, except such as shall be paid or satisfied by the receivers, upon the court adjudging the same to be prior in lien or superior in equity to said mortgage, and directing payment thereof. All payments for any such purpose made by the purchasers in advance of the final accounting and discharge of the receivers shall be treated as advances, and subject to final adjustment upon such accounting. The purchaser of such railroad, property, and franchises shall also take the same subject to the performance by him or his successors or assigns of all pending contracts in respect thereof theretofore lawfully made by the receivers. In the event that the purchaser of said railroad, property, and franchises, his successors or assigns, after demand made, shall refuse to pay any of the before-mentioned indebtedness or liabilities, the person holding the claim therefor, upon fifteen days' notice to such purchaser and his successors or assigns, may file his petition in this court to have such claim enforced against the property sold, in accordance with the usual practice of this court in relation to claims of similar character; and such purchaser and his successors and assigns shall have the right to appear and make defense to any claim, debt, or demand so sought to be enforced, and any party shall have the right to appeal from any judgment, decree, or order made thereon. For the purpose of enforcing the foregoing provisions of this decree, jurisdiction of this cause is retained by this court; and the court retains the right to retake and resell said property in case said purchaser or his successors or assigns shall fail to comply with any order of the court in respect to the payment of such prior indebtedness or liabilities within thirty days after service of a copy of such order."

It will be noted that "all unpaid indebtedness or liability contracted or incurred by the defendants, or either of them, in the operation of said railroad and property sold, which is prior in lien or superior in equity to said mortgage," constitutes one of the subjects of the jurisdiction reserved by this court, but it has no reference to

rights not affecting the property sold and conveyed under this decree and deed; and therefore the first question to be settled is whether the rights involved in the suit in the state court embraces this classification of property, and this inquiry necessitates a distinction between the property designated as the superstructure and the trestle. As to the former, it appears that the rails, ties, etc., were furnished and located upon the roadbed by the lessor company under the terms of the contract of April, 1893, which was never carried out in the particulars already mentioned. Under these circumstances, the railway company insists that the superstructure never became a part of the freehold of the locus in quo, but remained as movable chattels, the property of said railway company, and that as such they passed to the purchaser under the judicial sale in these causes; the mortgages having been so formulated as to include after-acquired property. This proposition has not been seriously combated in the argument of the case, and the authorities cited conclusively establish its soundness. It has been repeatedly held that, where a railroad company lays its track upon the land of others, it cannot be considered a part of the realty in any subsequent suit of the owner for compensation for the land taken. A case of striking analogy is that of Northern Cent. Ry. Co. v. Canton Co. of Baltimore, 30 Md. 347. The appellant in that case at its own cost constructed a railway track on the lands of the Canton Company, with the license and permission of the latter, having reason to believe that it was laying its railroad on lands over which it had the free right of way; and the question afterwards arose whether, under the circumstances, the track had become realty, so as to be recoverable in an action of ejectment. It was held otherwise, and this conclusion was cited with approval by the supreme court of the United States in Wiggins Ferry Co. v. Ohio & M. R. Co., 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055, where this recognized rule was further illustrated and enforced. As to what fixtures are removable by a tenant, Van Ness v. Pacard, 2 Pet. 137, 7 L. Ed. 374.

The property of the superstructure, therefore, must be treated as having passed under the foreclosure to the petitioner, subject to the terms of the decree and deed; and it only remains to determine whether the right asserted in the state court involves such claim or liability as is defined by the decree. As to the real character of the claim upon this property asserted in the state court, the answer and the argument of the mining company betray some uncertainty. Allusion has already been made to one averment of the answer, that the rights of the parties are set forth in the contract of April, 1893; another averment is "that upon a just construction of said contract said mining company had an equitable lien aforesaid upon said branch road," etc.; and, if the wrong complained of in the state court consists in the removal of the property in alleged violation of such an equitable lien, the demand would seem to come within the plain terms of the decree. Whatever may be the character of this claim, liability, or lien of the mining company upon the property in question, it is at least referable, upon the averments and admissions of the mining company itself, to the contract of 1893; and

arising, therefore, anterior to the foreclosure of the mortgage, the purchaser under the decree can only be required to satisfy such demand when superior to the lien of the mortgage itself, and this question has been definitely reserved for the jurisdiction of this court. Reservations of this character are not infrequent in modern decrees of foreclosure, and are uniformly sustained. Railroad Co. v. Scott (C. C. 1882) 13 Fed. 793; Jessup v. Railroad Co. (C. C. 1890) 44 Fed. 663; Central Trust Co. v. St. Louis, A. & T. R. Co. (C. C. 1893) 59 Fed. 385. Referring to the right of a purchaser to defend his title in the forum of the sale, Judge Simonton, in Central Trust Co. v. Western N. C. R. Co. (C. C.) 89 Fed. 24, said:

"The title held by the mortgagor passes under the decree to the purchaser upon the consummation of the sale by the master's or sheriff's deed. As against all parties to the suit, his title is gone; and as the right of possession, as against them, follows the title, it would be a useless and vexatious course to require the purchaser to obtain such possession by another suit. Such is not the course of procedure adopted by a court of equity."

The power of a court first acquiring cognizance of a controversy has been recently emphasized by the court of appeals of Virginia in the case of Craig v. Hoge, 95 Va. 275, 28 S. E. 317, where it is said:

"Having first acquired jurisdiction, it is entitled to retain it until the end of the litigation, and should proceed to decide all questions which legitimately flow out of the subject-matter of the controversy in the case, and finally dispose of it."

With reference to the trestle, however, it cannot be contended that it ever constituted any part of the assets in these causes. It was constructed by the mining company, at its own expense, upon land to which it claimed title; and while there is much force in the contention of the railway company that in the partial execution of the contract of April, 1893, it contributed a considerable fund towards the cost of the trestle and roadbed, it must be admitted, on the other hand, that in the taking of this trestle there was something more involved than the rights of the parties under the contract of April, 1893. In the removal of this trestle, whatever may have been the equitable claims of the railway company, it converted to its own use property which, so far as the record shows, was owned by the mining company, and thereby gave rise to demands supervening the contract of April, 1893, and not within any provision or reservation in the decree of sale. It is therefore the conclusion of this court that as to any claims asserted in the action at law pending in the state court against the railway company on account of its removal of the rails, ties, frogs, switches, and fastenings embraced in what has been called the "superstructure," the injunction must be maintained and perpetuated, but with respect to the demand asserted in said action at law on account of the taking and removal of the trestle the injunction must be dissolved, without allowance of costs to either party.